# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | |
|---|---|
| **GREGORY BOURKE, et al.,** | CASE No. 3:13-CV-750 (JGH) |
| Plaintiffs, | |
| v. | Electronically Filed |
| **STEVE BESHEAR, et al.,** | |
| Defendants. | |

---

## BRIEF OF *AMICUS CURIAE* THE FAMILY TRUST FOUNDATION OF KENTUCKY, INC., IN SUPPORT OF DEFENDANTS' OPPOSITION TO <u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

Respectfully submitted,

*/s/ Stanton L. Cave*
_____

Stanton L. Cave, Esq.
LAW OFFICE OF STAN CAVE
P.O. Box 910457
Lexington, KY  40591-0457
Telephone:    (859) 309-3000
Facsimile:    (859) 309-3001
Email:        stan.cave@insightbb.com
*Counsel for Amicus Curiae, The Family Trust Foundation of Kentucky, Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

I.      RATIONAL BASIS REVIEW IS HIGHLY DEFERENTIAL ......................................... 2

II.     KENTUCKY HAS MYRIAD RATIONAL BASES TO PRESERVE
        MARRIAGE AS A LEGAL STATUS EXCLUSIVE TO OPPOSITE-SEX
        COUPLES ............................................................................................................... 3

        A.      Responsible Procreation and Childrearing Have Been Animating Purposes
                of Marriage in Virtually Every Society ................................................................ 4

        B.      Marriage Has Traditionally Steered Naturally Procreative Relationships
                into Stable Unions, and That Interest is Not Implicated by Same-Sex
                Relationships ................................................................................................... 7

        C.      Marriage Promotes the Optimal Childrearing Environment of Both a
                Mother and a Father, and it is Rational for Kentucky to Preference that
                Arrangement ................................................................................................... 10

        D.      It is Rational for Kentucky to Proceed with Caution When Considering
                Watershed Changes in How the State Defines Marriage ....................................... 15

III.    KENTUCKY'S MARRIAGE LAWS EASILY SATISFY RATIONAL BASIS
        REVIEW AND ARE THEREFORE FREE FROM CONSTITUTIONAL
        INFIRMITY ............................................................................................................. 17

IV.     CONCLUSION ........................................................................................................ 19

# TABLE OF AUTHORITIES

<u>*Cases*</u>:

*Adams v. Howerton,*

　　486 F. Supp. 1119 (C.D. Cal. 1980) ................................................................. 7, 8

*Andersen v. King County,*

　　138 P.3d 963 (Wash. 2006)...................................................................................6, 8

*Baker v. Nelson,*

　　191 N.W.2d 185 (Minn. 1971)....................................................................................8

*Board of Trustees of the University of Alabama v. Garrett,*

　　531 U.S. 356 (2001)...................................................................................................9

*Bowen v. Gilliard,*

　　483 U.S. 587 (1987)..................................................................................................12

*Brotherhood of Locomotive Firemen & Enginemen v. Chicago, Rock Island, & Pacific Railroad Co.,*

　　393 U.S. 129 (1968)..................................................................................................18

*Citizens for Equal Protection v. Bruning,*

　　455 F.3d 859 (8th Cir. 2006) .......................................................................6, 8, 9, 12

*City of Cleburne, Tex. v. Cleburne Living Center,*

　　473 U.S. 432 (1985)..........................................................................................2, 9, 10

*City of New Orleans v. Dukes,*

　　427 U.S. 297 (1976)....................................................................................................2

*Conaway v. Deane,*

　　932 A.2d 571 (Md. 2007) .......................................................................................6, 8

*Dean v. District of Columbia*,

    653 A.2d 307 (D.C. 1995) ...............................................................................6

*DeShaney v. Winnebago County Department Social Services*,

    812 F.2d 298 (7th Cir. 1987) ..........................................................................18

*FCC v. Beach Communications, Inc.*,

    508 U.S. 307 (1993)................................................................................2, 3, 4

*Harris v. McRae*,

    448 U.S. 297 (1980)......................................................................................18

*Heller v. Doe*,

    509 U.S. 312 (1993)..........................................................................2, 3, 9, 17

*Hernandez v. Robles*,

    855 N.E.2d 1 (N.Y. 2006) ...........................................................6, 8, 9, 12

*Jackson v. Abercrombie*,

    884 F. Supp. 2d 1065 (D. Haw. 2012) .......................................................6, 16

*Johnson v. Robison*,

    415 U.S. 361 (1974).................................................................................10, 18

*In re Kandu*,

    315 B.R. 123 (Bankr. W.D. Wash. 2004) ......................................................8

*In re Marriage of J.B. & H.B.*,

    326 S.W.3d 654 (Tex. Ct. App. 2010) ...........................................................8

*Lewis v. Harris*,

    908 A.2d 196 (N.J. 2006).............................................................................17

*Lofton v. Secretary of Department of Children & Family Services,*

358 F.3d 804 (8th Cir. 2004) ....................................................................10, 12, 14

*Maher v. Roe,*

432 U.S. 464 (1977)..........................................................................................18

*Massachusetts Board of Retirement v. Murgia,*

427 U.S. 307 (1976)............................................................................................2

*Maynard v. Hill,*

125 U.S. 190 (1888)............................................................................................6

*Morrison v. Sadler,*

821 N.E.2d 15 (Ind. Ct. App. 2005)........................................................6, 8, 9, 10

*Nguyen v. INS,*

533 U.S. 53 (2001)..........................................................................................8, 9

*Singer v. Hara,*

522 P.2d 1187, 1197 (Wash. Ct. App. 1974)..........................................................8

*S.J.L.S. v. T.L.S.,*

265 S.W. 3d 804 (Ky. Ct. App. 2008) .................................................................15

*Skinner v. State of Oklahoma.,*

316 U.S. 535 (1942)............................................................................................6

*Standhardt v. Superior Court,*

77 P.3d 451 (Ariz. Ct. App. 2003)........................................................................8

*Vacco v. Quill,*

521 U.S. 793 (1997)............................................................................................9

*Vance v. Bradley*,

    440 U.S. 93 (1979)............................................................................................10, 18

*Williamson v. Lee Optical of Oklahoma*,

    348 U.S. 483 (1955)..................................................................................................15

*Wilson v. Ake*,

    354 F. Supp. 2d 1298 (M.D. Fla. 2005) ....................................................................8

## *Statutes*:

Ky. Const. § 233A ...............................................................................................1, 15

Ky. Rev. Stat. § 402.005 ............................................................................................1

Ky. Rev. Stat. § 402.020(1) (d) .................................................................................1

Ky. Rev. Stat. § 402.040(2) .................................................................................1, 15

Ky. Rev. Stat. § 402.045 ............................................................................................1

Ky. Rev. Stat. § 402.045(1) .......................................................................................1

## *Other Authorities*:

Paul R. Amato, *More Than Money? Men's Contributions to Their Children's Lives?*, *in Men in Families*, When Do They Get Involved? What Difference Does It Make? 267 (Alan Booth & Ann C. Crouter eds., 1998) ...........................................................13

Paul R. Amato & Fernando Rivera, *Paternal Involvement and Children's Behavior Problems*, 61 J. Marriage & Fam. 375-84 (1999)...................................................13

Joel Prentiss Bishop, *Commentaries on the Law of Marriage & Divorce* (6th ed. 1881)...............5

Andrew J. Cherlin, *The Deinstitutionalization of American Marriage*, 66 J. Marriage & Family 848 (2004)...................................................................................................16

CNN.com Election Results, America Votes 2004, http://www.cnn.com/ELECTION/2004/pages/results/ballot.measures/ (last accessed January 10, 2014)...........................................................................................................1

*The Meaning & Significance of Marriage in Contemporary Society*, *in Contemporary Marriage: Comparative Perspectives on a Changing Institution* (Kingsley Davis, ed. 1985) ..........................................................................................................................5

M. DeWolff & M. van Izjendoorn, *Sensitivity and Attachment: A Meta-Analysis on Parental Antecedents of Infant Attachment*, 68 Child Dev. 571-91 (1997)............................13

William J. Doherty, *et al.*, *Responsible Fathering*, 60 J. Marriage & Family 277 (1998) ...........11

Ruth Feldman, *Oxytocin and Social Affiliation In Humans*, 61 Hormones & Behav. 380-91 (2012)...................................................................................................................................13

Robert P. George, *et al.*, *What is Marriage?* 34 Harv. J. L. & Pub. Pol'y 245 (Winter 2010) ...............................................................................................................................................7

E.J. Graff, *Retying the Knot, in Same-Sex Marriage: Pro and Con: A Reader*, 136 (Andrew Sullivan ed., Updated ed., Vintage Books 2004).....................................................16

Michael E. Lamb, *Fathers: Forgotten Contributors to Child Development*, 18 Human Dev. 245 (1975) ...............................................................................................................................11

Claude Levi-Strauss, *Introduction* to Andre Burguiere, *et al.* (eds.), 1 A History of the Family: Distant Worlds, Ancient Worlds 5 (1996)...................................................................4

Bronislaw Malinowski, *Sex, Culture, and Myth* (1962) ..........................................................5

M. Main & J. Solomon, *Discovery of an Insecure-Disorganized Disoriented Attachment Pattern, in Affective Development in Infancy* 95-124 (T.B. Brazelton &  M.W. Yogman eds., 1986) .......................................................................................................................13

Loren D. Marks, *Same-Sex Parenting and Children's Outcomes: A Closer Examination of the American Psychological Association's Brief on Lesbian and Gay Parenting*, 41 Soc. Sci. Research 735 (2012) ........................................................................................................12

Sara McLanahan & Gary Sandefur, *Growing Up with a Single Parent: What Hurts, What Helps* (1994)..................................................................................................................11, 13

Kristen Anderson Moore, *et al.*, *Marriage from a Child's Perspective*, Child Trends Research Brief (June 2002)...................................................................................................8, 10

C.A. Nelson & M. Bosquet, *Neurobiology of Fetal and Infant Development: Implications for Infant Mental Health*, in Handbook of Infant Mental Health 37-59 (C.H. Zeanah Jr. ed., 2d ed. 2000)........................................................................................................................13

Daniel Paquette & Mark Bigras, *The Risky Situation: A Procedure for Assessing the Father-Child Activation Relationship*, 180 Early Childhood Dev. & Care 33-50 (2010) .................................................................................................................................................13

Ross D. Parke, *Fatherhood* 6-7 (Developing Child Series, Jerome Bruner *et al.* eds., 1996) ...............................................................................................................................................13

David Popenoe, *Life Without Father: Compelling New Evidence that Fatherhood & Marriage are Indispensable for the Good of Children & Society* (1996)................................11

Kyle Pruett, *Fatherneed* (2000) ..................................................................................................11

G. Robina Quale, *A History of Marriage Systems* (1988) .............................................................5

Mark Regnerus, *How Different are the Adult Children of Parents who have Same-Sex Relationships? Findings from the New Family Structures Study*, 41 Soc. Sci. Research 752 (2012) ...........................................................................................................................12

Mark D. Regnerus & Laura B. Luchies, *The Parent-Child Relationship and Opportunities for Adolescents' First Sex*, 27 J. Fam. Issues 159-83 (2006)....................................................13

Bertrand Russell, *Marriage & Morals* (Liveright Paperbound Edition, 1970)..............................6

Isabel V. Sawhill, *Families at Risk, in* Setting National Priorities: The 2000 Election and Beyond (Henry J. Aaron & Robert Danton Reischauer, eds. 1999) ..........................................8

Shmuel Shulman and Moshe M. Klein, *Distinctive Role of the Father in Adolescent Separation-Individuation*, 62 New Dir. Child & Adolesc. Dev. 41, 53 (1993)......................13

Michelangelo Signorile, *Bridal Wave*, Out Magazine 161 (Dec. 1994) ........................................16

Judith Stacy, *Gay and Lesbian Families: Queer Like Us, in All Our Families: New Policies for a New Century*, 117 (Mary Ann Mason *et al*., eds., Oxford U. Press 1998)........16

*Daddy Dearest?: Active Fatherhood and Public Policy*, Institute for Public Policy Research 57 (Kate Stanley ed., 2005) ....................................................................................11

W. Bradford Wilcox, *et al.*, eds., *Why Marriage Matters: Twenty-Six Conclusions from the Social Sciences* (2d ed. 2005) ..........................................................................................5, 14

James Q. Wilson, *The Marriage Problem* (2002)....................................................................5, 11

Witherspoon Institute, *Marriage and the Public Good: Ten Principles* (2008)...........................15

## <u>INTRODUCTION</u>

*Amicus curiae,* The Family Trust Foundation of Kentucky, Inc. ("The Family Foundation"), hereby submits this brief in support of the constitutionality of Kentucky's Marriage Laws, which define marriage as the union of one man and one woman.[1]  Plaintiffs argue that this definition — which has existed in Kentucky since its inception and was overwhelmingly enshrined in the Kentucky Constitution by voters in 2004[2]—violates the due process and equal protection guarantees of the United States Constitution.  Plaintiffs contend that "Kentucky cannot articulate any legitimate purpose" for continuing to define marriage as the union of one man and one woman.  Plaintiffs' Memorandum at p. 14.   The plaintiffs are mistaken.  In their response to plaintiffs' motion for summary judgment [Doc. 39] the Kentucky defendants provided ample authority for the proposition that Kentucky's Marriage Laws are subject to the rational basis standard for review and argued that defining marriage as the union of one man and one woman is rationally related to the state's interest in affirming the traditional institution of marriage. The Family Foundation endorses those arguments and provides the Court here with additional and a more detailed treatment of the myriad legitimate state interests animating Kentucky's Marriage

---

[1] *See* Ky. Rev. Stat. § 402.005 ("As used and recognized in the law of the Commonwealth, 'marriage' refers only to the civil status, condition, or relation of one (1) man and one (1) woman united in law for life, for the discharge to each other and the community of the duties legally incumbent upon those whose association is founded on the distinction of sex."); Ky. Rev. Stat. § 402.020(1) (d) ("Marriage is prohibited and void . . . [b]etween members of the same sex . . ."); Ky. Rev. Stat. § 402.040(2) ("A marriage between members of the same sex is against Kentucky public policy and shall be subject to the prohibitions established in KRS 402.045."); Ky. Rev. Stat. § 402.045(1) ("A marriage between members of the same sex which occurs in another jurisdiction shall be void in Kentucky."); Ky. Const. § 233A ("Only a marriage between one man and one woman shall be valid or recognized as a marriage in Kentucky. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized.").

[2] *See* CNN.com Election Results, America Votes 2004, available at http://www.cnn.com/ELECTION/2004/pages/results/ballot.measures/ (last accessed January 10, 2014) (reporting that Kentucky Amendment 1 (later numbered as Ky. Const. § 233A), which reaffirmed the definition of marriage as the union of one man and one woman, was passed by a 75% majority vote of the People of Kentucky).

Laws.  Once the Court considers all the conceivable justifications for these laws, as it is obligated to do under existing jurisprudence, it should easily conclude that these laws pass constitutional muster.

## I.   RATIONAL BASIS REVIEW IS HIGHLY DEFERENTIAL.

As the plaintiffs themselves concede, it is undeniable that rational basis review is exceedingly deferential.[3]  Indeed, the Supreme Court itself has characterized the standard as a "paradigm of judicial restraint."  *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 314 (1993).  Put simply, unless a law burdens a fundamental right or targets a suspect class, neither of which applies here, a court must reject an equal protection challenge "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Id*. at 313.

This wide latitude, routinely granted by courts to legislatures on social and economic matters, reflects "the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one."  *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 314 (1976); *see also City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (wide latitude granted results from presumption that "even improvident decisions will eventually be rectified by the democratic processes").  Under rational basis review a court may not "sit as a superlegislature to judge the . . . desirability of legislative policy determinations . . ." *City of New Orleans v. Dukes,* 427 U.S. 297, 303 (1976), and is without "license . . . to judge the wisdom, fairness, or logic of [those] legislative choices."  *Beach Commc'ns, Inc.,* 508 U.S. at 313.

Rational basis review presumes a law to be constitutional and the "burden is on the one attacking the legislative arrangement to negative *every conceivable basis* which might support it."  *Heller v. Doe*, 509 U.S. 312, 320 (1993) (internal quotation marks and citations omitted) (emphasis added).  The plaintiffs seem to suggest that it is incumbent upon Kentucky to identify

---

[3] *See* Plaintiffs' Memorandum at 13-14.

a legitimate interest that is advanced by denying marriage to same-sex couples.  To proceed as if this were the operative calculus would turn the requirements and burdens of rational basis review on its head.  It is *plaintiffs* who must show that Kentucky's Marriage Laws lack *any* conceivable basis.  To this end, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends."  *Id*. at 321.

In defending an equal protection challenge, a state need not produce record evidence to sustain its statutory classification as rational and show that the classification does not violate equal protection if a law in practice results in some inequality or merely lacks "mathematical nicety".  *Id.* (internal quotations and citations omitted).  A legislature is not even required to actually articulate the purpose or rationale supporting its classification.  "[I]t is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."  *Beach Commc'ns, Inc.,* 508 U.S. at 315 ("a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data").  Thus this Court must consider not only the legislature's stated rationales, but also any conceivable justifications that may support Kentucky's Marriage Laws.

## II.    KENTUCKY HAS MYRIAD RATIONAL BASES TO PRESERVE MARRIAGE AS A LEGAL STATUS EXCLUSIVE TO OPPOSITE-SEX COUPLES.

The Commonwealth of Kentucky and its people have a host of not only rational, but compelling, reasons for preserving the definition of marriage as the union of one man and one woman.  Plaintiffs pretend that these reasons do not exist and contend that Kentucky's Marriage Laws are predicated upon nothing more than "blatant discrimination." Plaintiffs' Memorandum at 14.  From their false premise, they argue that because neither the "preservation of tradition" nor "arbitrary and invidious discrimination" are legitimate purposes, Kentucky's Marriage Laws

must be found constitutionally infirm. *Id*. at 15.[4]  Again, the plaintiffs are in error.  Kentucky's

Marriage Laws embody more than a mere preservation of tradition and are not products of

invidious calculations.  Indeed, a brief review of the universally animating purposes of marriage

confirms the rationality of Kentucky's Marriage Laws and leads to the ineluctable conclusion

that these laws pass constitutional muster.

> **A.    Responsible Procreation and Childrearing have been Animating Purposes of
> Marriage in Virtually Every Society.**

Kentucky's definition of marriage as an opposite-sex union is not unique.  It is the same

definition known throughout history, regardless of culture, religion or geography. And although

certain nonessential features of marriage have varied from culture to culture, its opposite-sex

nature has been the institution's defining, enduring and, until very recently, unquestioned

characteristic. It is no overstatement to say that marriage as an opposite-sex union is a

phenomenon of human society without equal.

Given the historic purposes of marriage, this universal phenomenon should not be surprising.

As famous anthropologist Claude Levi-Strauss observed, marriage is "a social institution with a

biological foundation."[5]  And government recognizes the institution for a very specific purpose:

through marriage the state seeks to increase the likelihood that children will be born and raised in

stable and enduring family units by both the mothers and the fathers who brought them into this

world.  Simply put, marriage regulates sexual relationships between men and women so that the

unique procreative capacity of such relationships benefits rather than harms society.  Absent this

---

[4] Notably, however, plaintiffs appear to concede that the legislature did indeed proffer serious and compelling justifications for Kentucky's Marriage Laws.  *See. e.g.*, Plaintiffs' Memorandum at 4 (noting that co-sponsoring Senator Gary Tapp anticipated that the laws would result in "stable marriages and strong families," and that co-sponsoring Senator Vernie McGaha explained that the laws were designed with the "stability of society" in mind).
[5] Claude Levi-Strauss, *Introduction* to Andre Burguiere, *et al*. (eds.), 1 A History of the Family: Distant Worlds, Ancient Worlds 5 (1996).

purpose, Kentucky, along with every other state, would have little reason to legally recognize the marriage relationship at all.

From time immemorial, Kentucky and other states *have* legally recognized marriage for good reason — to encourage and support responsible procreation and childrearing, which inevitably strengthens families and redounds to the benefit of society in general.  Eminent sociologist and demographer Kingsley Davis aptly described this dynamic:

> The family is the part of the institutional system through which the creation, nurture, and socialization of the next generation is mainly accomplished. . . . The genius of the family system is that, through it, the society normally holds the biological parents responsible for each other and for their offspring. By identifying children with their parents . . . the social system powerfully motivates individuals to settle into a sexual union and take care of the ensuing offspring.

*The Meaning & Significance of Marriage in Contemporary Society* 7-8, *in Contemporary Marriage: Comparative Perspectives on a Changing Institution* (Kingsley Davis, ed. 1985). Throughout history, other leading linguists, lawyers, anthropologists, historians, and social scientists have likewise consistently recognized the essential connection between marriage and responsible procreation and childrearing.[6]

---

[6] *See, e.g.*, W. Bradford Wilcox, *et al.*, eds., *Why Marriage Matters* 15 (2d ed. 2005) ("As a virtually universal human idea, marriage is about regulating the reproduction of children, families, and society."); James Q. Wilson, *The Marriage Problem* 41 (2002) ("Marriage is a socially arranged solution for the problem of getting people to stay together and care for children that the mere desire for children, and the sex that makes children possible, does not solve."); G. Robina Quale, *A History of Marriage Systems* 2 (1988) ("Through marriage, children can be assured of being born to both a man and a woman who will care for them as they mature."); Bronislaw Malinowski, *Sex, Culture, and Myth* 11 (1962) ("the institution of marriage is primarily determined by the needs of the offspring, by the dependence of the children upon their parents"); Joel Prentiss Bishop, *Commentaries on the Law of Marriage & Divorce* § 16 (6th ed. 1881) ("If the husband is under obligation to support his wife, so likewise is he to support his children. ... The relation of parent and child, equally with that of husband and wife, from which the former relation proceeds, is a civil status").

As these and many other authorities illustrate, the understanding of marriage as a union of one man and one woman, uniquely involving the rearing of children born of their union, is age-old, universal and enduring. Prior to the recent movement to redefine marriage to include same-sex relationships, it was commonly understood — without a hint of controversy — that the institution of marriage owed its very existence to society's vital interest in responsible procreation and childrearing. That is undoubtedly why the U.S. Supreme Court has long recognized marriage as "the foundation of the family and society, without which there would be neither civilization nor progress." *Maynard v. Hill*, 125 U.S. 190, 211 (1888); *see also Skinner v. State of Okl.*, 316 U.S. 535, 541 (1942) ("Marriage and procreation are fundamental to the very existence and survival of the race."); *Dean v. District of Columbia*, 653 A.2d 307, 332 (D.C. 1995) (finding that the Supreme Court has deemed the right to marry fundamental "*because of its link to procreation"*) (emphasis added).  A myriad of other courts, both federal and state, have recognized marriage as an institution uniquely able to address the procreative capacity of opposite-sex relationships, and thus to curb the very real threats that capacity can pose to the interests of society and to the welfare of children conceived unintentionally.  *See, e.g. Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 867 (8th Cir. 2006); *Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1111-12 (D. Haw. 2012); *Conaway v. Deane*, 932 A.2d 571, 630 (Md. 2007); *Hernandez v. Robles*, 855 N.E.2d 1, 7 (N.Y. 2006); *Andersen v. King Cnty.*, 138 P.3d 963, 982-83 (Wash. 2006); *Morrison v. Sadler*, 821 N.E.2d 15, 24-25 (Ind. Ct. App. 2005).

Certainly no other purpose can plausibly explain the ubiquity of the institution.  As atheist philosopher Bertrand Russell put it, "[b]ut for children, there would be no need of any institution concerned with sex."  Bertrand Russell, *Marriage & Morals* 77 (Liveright Paperbound Edition, 1970).  Indeed, if "human beings reproduced asexually and . . . human offspring were self-

sufficient[,] . . . would *any* culture have developed an institution *anything like* what we know as marriage? It seems clear that the answer is no." Robert P. George, *et al.*, *What is Marriage?* 34 Harv. J. L. & Pub. Pol'y 245, 286-87 (Winter 2010) (emphasis added). Thus, like every other society that has maintained, preserved and protected the institution of opposite-sex definition of marriage, Kentucky's Marriage Laws are predicated upon numerous rational bases, including the solicitude for the welfare of Kentucky's children which alone serves as a rational basis for Kentucky's Marriage Laws.

### B. Marriage Has Traditionally Steered Naturally Procreative Relationships into Stable Unions, and That Interest is Not Implicated by Same-Sex Relationships.

The traditional opposite-sex definition of marriage codified in Kentucky's Marriage Laws *at the very least* plainly bears a rational relationship to society's interest in increasing the likelihood that children will be born to the couples who brought them into the world and who will raise them in stable and enduring family units. *See Adams v. Howerton*, 486 F. Supp. 1119, 1124 (C.D. Cal. 1980) ("[I]t seems beyond dispute that the state has a compelling interest in encouraging and fostering procreation of the race and providing status and stability to the environment in which children are raised.").   Because only sexual relationships between men and women can produce children, such relationships have the potential to further — or harm — the state's interest in stability in a way, and to an extent, that other types of relationships do not. Kentucky's Marriage Laws provide special recognition to opposite-sex couples as an incentive for individuals to channel their potentially procreative conduct into productive and enduring relationships.

Kentucky's interest in marriage is sharply underscored by the undisputed truth that when procreation and childrearing take place outside stable family units, children suffer.  A leading survey of social science research explains that "[t]here is . . . value for children in promoting

7

strong, stable marriages between biological parents" precisely because "[c]hildren in single-parent families, children born to unmarried mothers, and children in stepfamilies or cohabiting relationships face higher risks of poor outcomes than do children in intact families headed by two biological parents."  Kristen Anderson Moore, *et al*., *Marriage from a Child's Perspective*, Child Trends Research Brief at 6 (June 2002).  In addition, when parents—and particularly fathers—do not take responsibility for their children, society is forced to step in to assist through social welfare programs and other means.[7]

Not surprisingly then, "a host of judicial decisions" have relied on the unique procreative capacity of opposite-sex relationships to conclude that "the many laws defining marriage as the union of one man and one woman . . . are rationally related to the government interest in 'steering procreation into marriage.'" *Citizens for Equal Prot.*, 455 F.3d at 867-68; *see also Wilson v. Ake*, 354 F. Supp. 2d 1298, 1308-09 (M.D. Fla. 2005); *In re Kandu*, 315 B.R. 123, 145-47 (Bankr. W.D. Wash. 2004); *Adams*, 486 F. Supp. at 1124-25; *In re Marriage of J.B. & H.B.*, 326 S.W.3d 654, 678 (Tex. Ct. App. 2010); *Singer v. Hara*, 522 P.2d 1187, 1197 (Wash. Ct. App. 1974): *Baker v. Nelson*, 191 N.W.2d 185, 186-87 (Minn. 1971).  This is also true of the majority of state courts interpreting their own constitutions. *See Standhardt v. Super. Ct.*, 77 P.3d 451, 461-64 (Ariz. Ct. App. 2003); *Morrison*, 821 N.E.2d at 23-31; *Conaway*, 932 A.2d at 630-34; *Hernandez*, 855 N.E.2d at 7; *Andersen*, 138 P.3d at 982-85.

As a simple and undeniable matter of biological fact, same-sex relationships, which cannot naturally produce offspring, do not implicate society's interest in responsible procreation in the same way that opposite-sex relationships do.  *See Nguyen v. INS*, 533 U.S. 53, 73 (2001) ("To

---

[7] According to a Brookings Institute study, $229 billion in welfare expenditures between 1970 and 1996 can be attributed to the breakdown of the marriage culture. Isabel V. Sawhill, *Families at Risk*, *in* Setting National Priorities: The 2000 Election and Beyond at 108 (Henry J. Aaron & Robert Danton Reischauer, eds. 1999).

fail to acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it.").  This biological reality, as well as marriage's central concern with responsible procreation and childrearing, is the "commonsense distinction," *Heller*, 509 U.S. at 326, that our law has traditionally drawn between same-sex couples (who are categorically incapable of natural procreation) and opposite-sex couples (who are generally capable of procreation).  This distinction "is neither surprising nor troublesome from a constitutional perspective," *Nguyen*, 533 U.S. at 63, because "where a group possesses distinguishing characteristics relevant to interests the State has authority to implement, a State's decision to act on the basis of those differences does not give rise to a constitutional violation." *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 366-67 (2001) (internal quotation marks and citations omitted); *accord Cleburne Living Ctr.*, 473 U.S. at 441.  Simply put, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Vacco v. Quill*, 521 U.S. 793, 799 (1997) (internal quotation marks and citations omitted).

Thus, even though some same-sex couples raise children, they cannot create them in the same way opposite-sex couples do — even if the unintended result of casual sexual behavior. As a result, same-sex relationships do not pose the same risk of irresponsible procreation that opposite-sex relationships do.  As courts have repeatedly explained, it is the unique procreative capacity of heterosexual relationships—and the very real threat that capacity can pose to the interests of society and to the welfare of children unintentionally conceived — that the institution of marriage has always sought to address.  *See, e.g.*, *Citizens for Equal Prot.*, 455 F.3d at 867; *Hernandez*, 855 N.E.2d at 7; *Morrison*, 821 N.E.2d at 24-25.

The line drawn by Kentucky's Marriage Laws, which rest on of the undeniable biological

distinction between same-sex and opposite-sex couples, cannot be said to "rest[] on grounds wholly irrelevant to the achievement of the [government's] objective."  *See Heller*, 509 U.S. at 324 (internal citation omitted).  It is well settled that a classification will be upheld when "the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not," *Johnson v. Robison*, 415 U.S. 361, 383 (1974), and, conversely, that the government may make special provision for a group if its activities "threaten legitimate interests . . . in a way that other [groups' activities] would not." *Cleburne*, 473 U.S. at 448; *see generally Vance v. Bradley*, 440 U.S. 93, 109 (1979) (law may "dr[aw] a line around those groups . . . thought most generally pertinent to its objective").   Accordingly, Kentucky's Marriage Laws readily satisfy rational-basis scrutiny.

### C.    Marriage Promotes the Optimal Childrearing Environment of Both a Mother and a Father, and it is Rational for Kentucky to Preference that Arrangement.

It is rational for Kentucky to specially recognize opposite-sex relationships in the form of marriages to promote the ideal that children should be raised by both a mother and a father in a stable family unit.  As the Eleventh Circuit has found, "[i]t is hard to conceive an interest more legitimate and more paramount for the state than promoting an optimal social structure for educating, socializing, and preparing its future citizens to become productive participants in civil society," and "[a]lthough social theorists . . . have proposed alternative child-rearing arrangements, none has proven as enduring as the marital family structure [between a man and a woman], nor has the accumulated wisdom of several millennia of human experience discovered a superior model." *Lofton v. Sec. of Dep't of Children & Family Svcs.*, 358 F.3d 804, 820 (8th Cir. 2004).  Modern social science accords with the views expressed by the court.

Research clearly shows that children benefit when they are raised in a stable family unit by the couple who brought them into this world. "[F]amily structure matters for children, and the

family structure that helps children the most is a family headed by two biological parents in a low-conflict marriage." Moore, *et al*., *Child Trends Research Brief* at 6.   There is little doubt that children benefit from having a parent of each sex.  In fact, "[t]he burden of social science evidence supports the idea that gender-differentiated parenting is important for human development and that the contribution of fathers to childrearing is unique and irreplaceable." David Popenoe, *Life Without Father: Compelling New Evidence that Fatherhood & Marriage are Indispensable for the Good of Children & Society* 146 (1996).[8]

Preferencing the optimal childrearing environment of mother and father through marriage status rests not only on common sense and the wisdom of the ages but also upon the considered research of social scientists.  For example, in nearly every case of unintended pregnancy the question is *not* whether the child will be raised by two opposite-sex parents or by two same-sex parents, but rather whether the child will be raised, on the one hand, by both the mother and father, or, on the other hand, by the mother alone, often with public assistance. *See, e.g.*, William J. Doherty, *et al*., *Responsible Fathering*, 60 J. Marriage & Family 277, 280 (1998) ("In nearly all cases, children born outside of marriage reside with their mothers.").  There can be absolutely no dispute that children raised in the former circumstances do better on average than children

---

[8] *See also* Michael E. Lamb, *Fathers: Forgotten Contributors to Child Development*, 18 Human Dev. 245, 246 (1975) ("Both mothers and fathers play crucial and qualitatively different roles in the socialization of the child"); *Daddy Dearest?: Active Fatherhood and Public Policy*, Institute for Public Policy Research 57 (Kate Stanley ed., 2005) (citing E. Flouri, Fathering and Child Outcomes (2005)) ("A substantial body of research now indicates that high levels of involvement by fathers in two-parent families are associated with a range of desirable outcomes in children and young people. . . . The converse is also true: low levels of involvement are associated with a range of negative outcomes."); Wilson, *The Marriage Problem* 169 ("The weight of scientific evidence seems clearly to support the view that fathers matter."); Kyle Pruett, *Fatherneed* 158 (2000) ("When it comes to choosing to raise a child without a father, the statistics are sobering: fatherless kids are more prone to depression than kids with a father, are twice as likely to be school dropouts, do less well and are more violent when in school, abuse more drugs, are more criminally active, try (and succeed at) suicide more often, and are at high risk for becoming teenage parents themselves.").

raised in the latter or that the state has a direct and compelling interest in avoiding the financial burdens and social costs too often associated with single parenthood.  *See, e.g.*, Sara McLanahan & Gary Sandefur, *Growing Up with a Single Parent: What Hurts, What Helps* 1 (1994) ("Children who grow up in a household with only one biological parent are worse off, on average, than children who grow up in a household with both of their biological parents, regardless of the parents' race or educational background, regardless of whether the parents are married when the child is born, and regardless of whether the resident parent remarries."). Additionally, recent findings confirm that children raised in alternative parenting structures — including households headed by same-sex partners — do not have nearly the same positive outcomes that children raised by a married biological mother and father do.  *See, e.g.,* Mark Regnerus, *How Different are the Adult Children of Parents who have Same-Sex Relationships? Findings from the New Family Structures Study*, 41 Soc. Sci. Research 752 (2012) (finding that children raised in same-sex households fared worse than children raised by married biological parents in a wide range of significant outcomes).  Another recent study reveals serious deficiencies in older studies claiming that there is no difference in outcomes for children raised by same-sex couples compared to those raised by married opposite-sex couples.  *See* Loren D. Marks, *Same-Sex Parenting and Children's Outcomes: A Closer Examination of the American Psychological Association's Brief on Lesbian and Gay Parenting*, 41 Soc. Sci. Research 735, 748 (2012).

Given the foregoing, it is not surprising that courts have repeatedly upheld as rational the "commonsense" notion that "children will do best with a mother and father in the home." *Hernandez*, 855 N.E.2d at 7-8; *see also*, *e.g.*, *Citizens for Equal Prot.*, 455 F.3d at 867; *Lofton*, 358 F.3d at 825-26; *cf. Bowen v. Gilliard*, 483 U.S. 587, 614 (1987) (Brennan, J., dissenting)

("the optimal situation for the child is to have both an involved mother and an involved father").

Indeed, current research on the psycho-social development of children continues to affirm that the complementarity of an intact family, with a mother and a father serving unique relational roles, is optimal for a child's healthy development.  *See, e.g.*, Ruth Feldman, *Oxytocin and Social Affiliation In Humans*, 61 Hormones & Behav. 380-91 (2012) (noting the different roles that mothers and fathers play across species and the importance of those differences to human development, and suggesting that human oxytocin systems may account for the different yet complementary maternal and paternal functions).[9]

---

[9] *See also* C.A. Nelson & M. Bosquet, *Neurobiology of Fetal and Infant Development: Implications for Infant Mental Health*, in Handbook of Infant Mental Health 37-59 (C.H. Zeanah Jr. ed., 2d ed. 2000); M. DeWolff & M. van Izjendoorn, *Sensitivity and Attachment: A Meta-Analysis on Parental Antecedents of Infant Attachment*, 68 Child Dev. 571-91 (1997); M. Main & J. Solomon, *Discovery of an Insecure-Disorganized Disoriented Attachment Pattern*, in *Affective Development in Infancy* 95-124 (T.B. Brazelton &  M.W. Yogman eds., 1986) (establishing that the natural biological responsiveness of a mother to her infant fosters critical aspects of neural development and capabilities for interactivity in the infant brain); Ross D. Parke, *Fatherhood* 6-7 (Developing Child Series, Jerome Bruner *et al.* eds., 1996) (establishing that in comparison to fathers, mothers generally maintain more frequent and open communication and enjoy greater emotional closeness with their children, in turn fostering a sense of security in children with respect to the support offered by the family structure, and also finding that mothers play a greater role than fathers in cultivating the language and communication skills of their children); Paul R. Amato, *More Than Money? Men's Contributions to Their Children's Lives?*, *in Men in Families*, When Do They Get Involved? What Difference Does It Make? 267 (Alan Booth & Ann C. Crouter eds., 1998) (finding that active maternal influence and input is vital to the breadth and depth of children's social ties, and determining that mothers play a central role in connecting children to friends and extended family); McLanahan & Sandefur, *supra*, (1994) (finding that having a father is associated with an increase in positive outcomes for children in domains such as education, physical health, and the avoidance of juvenile delinquency); Daniel Paquette & Mark Bigras, *The Risky Situation: A Procedure for Assessing the Father-Child Activation Relationship*, 180 Early Childhood Dev. & Care 33-50 (2010) (finding that fathers are more likely than mothers to supervise children at play while refraining from intervention in the child's activities, a pattern that stimulates "exploration, controlled risk-taking, and competition"); Paul R. Amato & Fernando Rivera, *Paternal Involvement and Children's Behavior Problems*, 61 J. Marriage & Fam. 375-84 (1999) (finding that paternal involvement is linked to lower levels of delinquency and criminal activity, even after controlling for maternal involvement); Parke, *supra*, at 6 (finding that fathers, as compared to mothers, are more likely to encourage children to try new things and to embrace novel

This substantial body of evidence demonstrates that mothers and fathers make unique contributions to a child's development. Same-sex parenting structures, by definition, exclude either a mother or a father. This is not to say that same-sex couples, like other parenting structures, cannot make admirable and successful efforts in raising children. They do, but the social science evidence, especially evidence founded on conclusions from population-based samples, suggests that there are unique advantages to a parenting structure consisting of both a mother and a father.  The Kentucky legislature, along with the people of Kentucky, could therefore, in the words of the Eleventh Circuit,

> rationally conclude that a family environment with married opposite-sex parents remains the optimal social structure in which to bear children, and that the raising of children by same-sex couples, who by definition cannot be the two sole biological parents of a child and cannot provide children with a parental authority figure of each gender, presents an alternative structure for child rearing that has not yet proved itself beyond reasonable scientific dispute to be as optimal as the biologically based marriage norm.

*Lofton*, 358 F.3d at 825, n.26 (citation omitted).   In so concluding, Kentucky has not run afoul of the dictates of equal protection.  On the contrary, the legislature and the people have given credence to the reality of lived experience and to the findings of modern social science by preserving marriage as an opposite-sex institution, a classification that is rationally related to the

---

situations and challenges); Shmuel Shulman and Moshe M. Klein, *Distinctive Role of the Father in Adolescent Separation-Individuation*, 62 New Dir. Child & Adolesc. Dev. 41, 53 (1993) (observing that "[f]athers, more than mothers, conveyed the feeling that they can rely on their adolescents, and concluding as a result that "fathers might provide a 'facilitating environment' for adolescent attainment of differentiation from the family and consolidation of independence"); Mark D. Regnerus & Laura B. Luchies, *The Parent-Child Relationship and Opportunities for Adolescents' First Sex*, 27 J. Fam. Issues 159-83 (2006) (noting that a study of 2000 adolescents showed that the father-daughter relationship, rather than the mother-daughter relationship, was an important predictor of whether and when adolescent girls transitioned to sexual activity); Wilcox, *et al.*, *Why Marriage Matters*, 18 (discussing evidence suggesting that female sexual development is slowed by early childhood exposure to pheromones of biological father, and accelerated by regular early childhood exposure to pheromones of adult male who is not child's biological father).

legitimate interest in fostering an environment most conducive to growing well-adjusted children and strong families.

### D.   It is Rational for Kentucky to Proceed with Caution when Considering Watershed Changes in How the State Defines Marriage.

Kentucky's Marriage Laws proceed from the legislature's considered judgment that a "marriage between members of the same sex is against Kentucky public policy," Ky. Rev. Stat. § 402.040(2), and this understanding has been ratified by the people of Kentucky and made part of its Constitution.  *See* Ky. Const. § 233A; *see also S.J.L.S. v. T.L.S.*, 265 S.W. 3d 804 (Ky. Ct. App. 2008) (finding that "public policy" against same-sex marriage was "clearly expressed by the Legislature in statute and by the People of the Commonwealth in its ratification of a Constitutional provision").  This policy determination, the product of much democratic thought and discussion, should be respected, for it is axiomatic that the legislature, and not the court, is the proper body to make law.  *See Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 487 (1955) ("[I]t is for the legislature, not the courts, to balance the advantages and disadvantages" of economic and social legislation).

Moreover, given the centrality of marriage and the family to the stability of society and the well-being of children, it is entirely rational and appropriate for Kentucky to proceed cautiously, through deliberative democratic processes, in deciding whether to fundamentally redefine and restructure an institution that has endured for millennia. It is not inconceivable that such a project could have a severe and negative impact on the institution and society as a whole.

Indeed, a large and diverse group of prominent scholars from all relevant academic fields recently expressed "dee[p] concerns about the institutional consequences of same-sex marriage for marriage itself," predicting that "[s]ame-sex marriage would further undercut the idea that procreation is intrinsically connected to marriage [and] the idea that children need both a mother

15

and a father, further weakening the societal norm that men should take responsibility for the

children they beget."  Witherspoon Institute, *Marriage and the Public Good: Ten Principles* 18-

19 (2008).  Other scholars, even those not opposing, or supporting, same-sex marriage, agree that

redefining marriage would work a profound alteration in society.  *See* Andrew J. Cherlin, *The*

*Deinstitutionalization of American Marriage*, 66 J. Marriage & Family 848, 848, 850 (2004)

(identifying same-sex marriage  as "[t]he most recent development in the deinstitutionalization of

marriage," which involves the "weakening of the social norms that define people's behavior in

. . . marriage," and which leads to a shift in the focus of marriage from serving vital social needs,

including those of children, to facilitating the personal fulfillment of individuals); Judith Stacy,

*Gay and Lesbian Families: Queer Like Us*, in *All Our Families: New Policies for a New*

*Century*, 117, 128-129 (Mary Ann Mason *et al*., eds., Oxford U. Press 1998) (predicting that

"[l]egitimizing gay marriage would promote a democratic, pluralist expansion of the meaning,

practice, and politics of family life in the United States," where people "might dare to question

the dyadic limitations of Western marriage and seek some of the benefits of extended family life

through small group marriages arranged to share resources, nurturance, and labor"); E.J. Graff,

*Retying the Knot*, *in Same-Sex Marriage: Pro and Con: A Reader*, 136 (Andrew Sullivan ed.,

updated ed., Vintage Books 2004) (predicting that if "same-sex marriage becomes legal, that

venerable institution will ever after stand for sexual choice, for cutting the link between sex and

diapers"); Michelangelo Signorile, *Bridal Wave*, Out Magazine 161 (Dec. 1994) (stating that

same-ex couples should "demand the right to marry not as a way of adhering to society's moral

codes but rather to debunk a myth and radically alter an archaic institution").  Numerous courts

agree that redefining marriage is a project of potentially monumental proportion and impact.  *See*

*Jackson*, 884 F. Supp. 2d at 1117 (holding that "it is not beyond rational speculation to conclude

that fundamentally altering the definition of marriage to include same-sex unions might result in undermining the societal understanding of the link between marriage, procreation, and family structure"); *Lewis v. Harris*, 908 A.2d 196, 222 (N.J. 2006) (predicting that altering the "shared societal meaning of marriage [which]  has always been the union of a man and a woman . . . would render a profound change in the public consciousness of a social institution of ancient origin").

Given the testimony of these authorities, and noting especially the breadth of opinion they represent on the subject of same-sex marriage, Kentucky is well within reason to deliberately evaluate the potential impacts of such a monumental change to its social fabric.  The Commonwealth should not be constitutionally compelled to race down this path while so many questions about the impact of redefining marriage remain unanswered.

## III.  KENTUCKY'S MARRRIAGE LAWS EASILY SATISFY RATIONAL BASIS REVIEW AND ARE THEREFORE FREE FROM CONSTITUTIONAL INFIRMITY.

It is rational, and therefore constitutional, for Kentucky to maintain the millennia-old definition of marriage in light of its historic, organic and still-vital purpose to steer naturally procreative relationships into marriage and to encourage the ideal of children being raised by both their biological mother and father. Moreover, it is rational to believe that changing the definition of marriage could alter or undermine those compelling social purposes for marriage. Any one of these bases for Kentucky's Marriage Laws suffices to satisfy rational basis review.

Indeed, the very fact that social scientists and other experts hotly debate these questions renders those laws constitutional, because a legislature's considered judgment on a *debatable matter* of social policy is rational.  *See Heller*, 509 U.S. at 333 (holding that even where the assumptions underlying a rationale are erroneous, the "very fact that they are arguable is sufficient, on rational-basis review, to immunize the legislative choice from constitutional

challenge") (internal quotation marks and citations omitted).  No amount of expert rebuttal on plaintiffs' part can change this fact.  For it is not the province of courts to act as legislative arbiters on questions of social policy.  *See Vance*, 440 U.S. at 112 (citation omitted) ("It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety.");  *Bhd. of Locomotive Firemen & Enginemen v. Chi., Rock Island, & Pac. R. Co.*, 393 U.S. 129, 138-39 (1968) (quotation marks omitted) (holding that a trial court's "responsibility for making findings of fact certainly does not authorize it to resolve conflicts in the evidence against the legislature's conclusion").

To argue that Kentucky's refusal to endorse all intimate relationships on identical terms constitutes an equal protection violation is to ignore that the Fourteenth Amendment, along with the rest of the Constitution, is a "charter of negative rather than positive liberties."  *DeShaney v. Winnebago Cnty. Dep't Soc. Servs.*, 812 F.2d 298, 301 (7th Cir. 1987); *see also Maher v. Roe*, 432 U.S. 464, 474 (1977) (finding that the Fourteenth Amendment, even in the case of fundamental rights, implies no limitation on the right of a state to make a value judgment and to implement that judgment through the allocation of public funds); *Harris v. McRae*, 448 U.S. 297, 317-18 (1980) (holding that the liberty protected by the Due Process Clause protects against unwarranted government interference, but does not "confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom"). Kentucky is thus constitutionally permitted to preference the definition of marriage that has existed since its inception and to direct its resources to implement that preference by making marriage a more attractive alternative than other relationships.

A law survives rational basis review where "the inclusion of one group promotes a legitimate

governmental purpose, and the addition of other groups would not." *Johnson*, 415 U.S. at 383. This standard is satisfied here.  Same-sex partners cannot procreate naturally with one another; nor can they both be biological parents to the same child.  Same-sex partners thus do not implicate Kentucky's interests in responsible procreation and childrearing in the same way that opposite-sex couples do, and therefore reserving to opposite-sex couples the status of marriage furthers interests that would not be furthered, or furthered to the same degree, as recognizing same-sex relationships as marriages.   Consequently, the challenged classification is eminently rational and therefore constitutional.

## IV.    CONCLUSION

For the foregoing reasons, *amicus curiae* The Family Foundation respectfully requests that this Court deny the plaintiffs' motion for summary judgment and *sua sponte* dismiss plaintiffs' claims in their entirety.

Respectfully submitted,

*/s/ Stanton L. Cave*
_____
Stanton L. Cave, Esq.
LAW OFFICE OF STAN CAVE
P.O. Box 910457
Lexington, KY  40591-0457
Telephone:    (859) 309-3000
Facsimile:      (859) 309-3001
Email: stan.cave@insightbb.com
*Counsel for The Family Trust Foundation of Kentucky, Inc.*

19

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2014, I electronically filed the foregoing document with the Clerk of Court using the ECF system, which will send notification of such filing to the following participants:

Daniel J. Canon, Esq.
Laura E. Landenwich, Esq.
Leonard J. Dunman, IV, Esq.
Louis Paz Winner, Esq.
Clay Daniel Walton Adams, PLC
462 South Fourth Street, Suite 101
Louisville, KY  40202

Dawn R. Elliott, Esq.
Shannon Renee Fauver
Fauver Law Office
1752 Frankfort Avenue
Louisville, KY  40206

Brian Thomas Judy, Esq.
Kentucky Cabinet for Health and Family Services
275 E. Main Street
5th Floor West
Frankfort, KY  40602-0001

Clay A. Barkley, Esq.
Kentucky Attorney General - Civil & Environmental Law Div.
700 Capital Avenue, Suite 118
Frankfort, KY  40601-3449

Stephanie A. French, Esq.
Jefferson County Attorney
531 Court Place, Suite 900
Louisville, KY  40202

Licha H. Farah, Jr., Esq.
Ward Hocker & Thornton, PLLC
716 Main Street, Suite 201
Louisville, KY  40202

*/s/ Stanton L. Cave*

_____

Stanton L. Cave, Esq.