UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:13-CV-750-H

TIMOTHY LOVE, *et al.*  PLAINTIFFS

V.

STEVE BESHEAR  DEFENDANT

## MEMORANDUM OPINION AND ORDER

Two same-sex couples who wish to marry in Kentucky have challenged Kentucky's constitutional and statutory provisions that prohibit them from doing so. *See* KY. CONST. § 233A; KY. REV. STAT. ANN. §§ 402.005, .020(1)(d) (West 2014).[1] On February 12, 2014, this Court held that, insofar as these provisions denied state recognition to same-sex couples who were validly married outside Kentucky, they violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *See Bourke v. Beshear*, 3:13-CV-750-H, 2014 WL 556729 (W.D. Ky. Feb. 12, 2014). Since then, these four Plaintiffs have intervened to assert their own related claims.[2]

Since the Supreme Court's landmark decision in *United States v. Windsor*, 133 S.Ct. 2675 (2013), every federal court to consider state bans on same-sex marriage and recognition has declared them unconstitutional. Most of these courts have done so under both the Due Process

---

[1] Sections 402.040(2) and .045 were also challenged, but these provisions address "[m]arriage in another state" and the recognition and enforceability of "[s]ame-sex marriage [solemnized] in another jurisdiction," respectively. KY. REV. STAT. ANN. §§ 402.040(2), .045 (West 2014). These sections do not seem to affect Plaintiffs' right to marry in the Commonwealth. To the extent that they do, this Memorandum Opinion and Order likewise applies to them.

[2] On February 26, the Court granted Plaintiffs Timothy Love, Lawrence Ysunza, Maurice Blanchard, and Dominique James's motion to intervene. On the same date, the *Bourke* order became final. On February 28, the Court stayed its enforcement to allow the state to prepare for compliance, and on March 19, the Court extended the stay pending resolution of the state's appeal before the Sixth Circuit Court of Appeals. On March 21, the Court dismissed Defendant Attorney General of Kentucky Jack Conway from this action upon his motion indicating that he would no longer defend the challenged provisions.

As *amici curiae*, the American Civil Liberties Union of Kentucky submitted a brief supporting the intervening Plaintiffs, and the Family Trust Foundation of Kentucky, Inc. submitted a brief in opposition.

and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.[3] This Court's opinion differs in that it does not determine whether Kentucky's laws interfere with a fundamental right. The Court's chief reason for declining to do so is its careful reading of *Windsor*, which suggests that the Supreme Court is unwilling and unlikely to view the right Plaintiffs seek to exercise as fundamental under the Constitution.

For the reasons that follow, this Court holds that the Commonwealth's exclusion of same-sex couples from civil marriage violates the Equal Protection Clause.

I.

This case arises from the same history discussed at length in *Bourke*, which the Court incorporates by reference. *See* 2014 WL 556729, at *1−2. Briefly, in 1998, Kentucky enacted statutory provisions that defined marriage as between one man and one woman and voided marriages between persons of the same sex.[4] Six years later, in 2004, Kentucky citizens voted to approve the following state constitutional amendment:

> Only a marriage between one man and one woman shall be valid or recognized as a marriage in Kentucky. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized.

---

[3] The Fourteenth Amendment to the U.S. Constitution provides, in pertinent part:
> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1.

[4] The pertinent text of these provisions is:
> 402.005: As used and recognized in the law of the Commonwealth, "marriage" refers only to the civil status, condition, or relation of one (1) man and one (1) woman united in law for life, for the discharge to each other and the community of the duties legally incumbent upon those whose association is founded on the distinction of sex.
> 402.020(1): Marriage is prohibited and void: (d) Between members of the same sex.
> 402.040(2): A marriage between members of the same sex is against Kentucky public policy and shall be subject to the prohibitions established in KRS 402.045.
> 402.045: (1) A marriage between members of the same sex which occurs in another jurisdiction shall be void in Kentucky. (2) Any rights granted by virtue of the marriage, or its termination, shall be unenforceable in Kentucky courts.

KY. REV. STAT. ANN. §§ 402.005−.045 (West 2014).

KY. CONST. § 233A. Plaintiffs here are Kentucky citizens who want to marry in Kentucky but are prevented from doing so under these laws because they are same-sex couples.

Timothy Love and Lawrence Ysunza reside in Louisville, Kentucky and have lived together for 34 years. On February 13, 2014, they requested a Kentucky marriage license from the Jefferson County Clerk's Office, presenting the requisite identification and filing fees. The Commonwealth refused to issue them a license because they are a same-sex couple. They allege that their inability to obtain a marriage license has affected them in many ways. For example, last summer, Love underwent emergency heart surgery, which had to be delayed in order to execute documents allowing Ysunza access and decision-making authority for Love. As another surgery for Love is imminent, the couple fears what will happen if complications arise. The couple fears that healthcare providers and assisted living facilities may not allow them to be together or care for each other as they age. In addition, the couple has had difficulties with professional service providers; they found out after they purchased their home that their real estate attorney disregarded their request to include survivorship rights in the deed.

Maurice Blanchard and Dominique James reside in Louisville, Kentucky and have been together for ten years. On June 3, 2006, they had a religious marriage ceremony in Louisville. On January 22, 2013, they requested a Kentucky marriage license from the Jefferson County Clerk's Office, presenting the requisite identification and filing fees. The Commonwealth refused to issue them a license because they are a same-sex couple. They too have faced challenges as a result. For example, they allege that their neighborhood association will not recognize them as a married couple because Kentucky does not allow them to marry. In addition, their inability to obtain parental rights as a married couple has deterred them from adopting children. They also share a number of Love and Ysunza's concerns.

3

Plaintiffs assert that Kentucky's laws violate the Equal Protection Clause by denying them a marriage license and refusing them the accompanying benefits that opposite-sex spouses enjoy. *See Bourke*, 2014 WL 556729, at *2−3 (describing these benefits in detail). These benefits include but are not limited to: lower income and estate taxes, leave from work under the Family and Medical Leave Act, family insurance coverage, the ability to adopt children as a couple, the participation in critical legal and medical decisions on behalf of one's partner, and, perhaps most importantly, the intangible and emotional benefits of civil marriage. Plaintiffs seek an order declaring the state's pertinent constitutional and statutory provisions unconstitutional and enjoining their enforcement.

Although many courts have discussed the Equal Protection and Due Process Clauses in tandem, ultimately, this Court sees this case as more clearly about the imposition of a classification than about the contours of a due process right. The constitutional question is whether a state can lawfully exclude a certain class of individuals, *i.e.* homosexual persons, from the status and dignity of marriage. The Court will resolve Plaintiffs' claims solely on equal protection grounds.[5]

No one disputes that Kentucky's laws treat same-sex couples differently than opposite-sex couples who wish to marry in Kentucky. No one disputes that the equal protection issue before the Court involves purely questions of law. Therefore, Plaintiffs' challenge is properly resolved on summary judgment. The Court must decide whether Kentucky's laws violate Plaintiffs' federal constitutional rights.

---

[5] Plaintiffs also allege that Kentucky's laws violate (1) the Due Process Clause of the Fourteenth Amendment, (2) the Establishment Clause of the First Amendment, (3) freedom of association as guaranteed by the First Amendment, and (4) the Supremacy Clause of Article VI.

II.

Before reaching the constitutional issues, the Court must address Defendant's preliminary argument that *Baker v. Nelson*, 409 U.S. 810 (1972), bars Plaintiffs' challenge to the Commonwealth's ban on same-sex marriage.[6] In *Baker*, the Supreme Court dismissed "for want of a substantial federal question" a challenge to a Minnesota Supreme Court ruling, which found that a same-sex couple did not have the right to marry under the federal Due Process or Equal Protection Clauses. *Id.* (per curiam); *see Baker v. Nelson*, 191 N.W.2d 185, 187 (Minn. 1971). Such a summary dismissal is usually binding precedent, *see Mandel v. Bradley*, 432 U.S. 173, 176 (1977), unless doctrinal developments indicate that the Court would rule differently now, *see Hicks v. Miranda*, 422 U.S. 332, 344 (1975). Today, it is difficult to take seriously the argument that *Baker* bars Plaintiffs' challenge.

Since 1972, a virtual tidal wave of pertinent doctrinal developments has swept across the constitutional landscape. For example, *Romer v. Evans* invalidated under the Equal Protection Clause a state constitutional amendment that discriminated on the basis of sexual orientation. 517 U.S. 620, 635−36 (1996). Shortly thereafter, *Lawrence v. Texas* invalidated under the Due Process Clause a state law criminalizing homosexual sodomy. 539 U.S. 558, 578 (2003). Most recently, *Windsor* held unconstitutional Section 3 of the Defense of Marriage Act ("DOMA"), 1 U.S.C. § 7, which defined "marriage" and "spouse" for the purposes of federal law in a way that excluded same-sex partners. 133 S.Ct. at 2695. In *Windsor*, the Supreme Court ignored the *Baker* issue in oral argument and in its opinion, even though the Second Circuit had ruled on it. *See Windsor v. United States*, 699 F.3d 169, 178−79 (2d Cir. 2012). The Court's silence

---

[6] This Court's *Bourke* analysis was limited in scope to the distribution of state benefits to same-sex couples validly married outside Kentucky. *See Bourke v. Beshear*, 3:13-CV-750-H, 2014 WL 556729, at *1 (W.D. Ky. Feb. 12, 2014). Therefore, the precedential value of *Baker* was not at issue.

supports a view that *Baker* is a dead letter.[7] *See Wolf v. Walker*, 14-CV-64-BBC, 2014 WL 2558444, at *5 (W.D. Wis. June 6, 2014). Indeed, since *Windsor*, almost every court to confront this issue has found that *Baker* is not controlling.[8] This Court concludes that, due to doctrinal developments, *Baker* does not bar consideration of Plaintiffs' claims.

III.

The most difficult part of the equal protection analysis here is determining the proper standard of review. Courts consider two factors. First, courts look to the "individual interests affected" by the challenged law. *Zablocki v. Redhail*, 434 U.S. 374, 383 (1978) (quotation omitted). If a statutory classification "significantly interferes with the exercise of [a fundamental] right," heightened scrutiny applies. *Id.*

Next, courts examine the "nature of the classification" imposed by the law. *Id.* The Supreme Court has fashioned three different levels of scrutiny that correspond to certain statutory classifications. Most statutory classifications receive rational basis review, under which the classification must only be "rationally related to a legitimate governmental purpose." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). Under this deferential standard, the law must be upheld if there is "any reasonably conceivable" set of facts that could provide a

---

[7] In addition, at the oral argument for *Windsor's* companion case *Hollingsworth v. Perry*, 133 S.Ct. 2652 (2013), Justice Ginsburg interrupted counsel's argument that *Baker* precluded the Court's consideration of the claim by saying: "Mr. Cooper, *Baker v. Nelson* was 1971. The Supreme Court hadn't even decided that gender-based classifications get any kind of heightened scrutiny." Transcript of Oral Argument at *12, *Hollingsworth v. Perry*, 133 S.Ct. 2652 (2013) (No. 12−144), *available at* 2013 WL 1212745.

[8] *See, e.g.*, *Kitchen v. Herbert*, No. 13-4178, 2014 WL 2868044, at *10 (10th Cir. June 25, 2014); *Baskin v. Bogan*, 1:14-CV-00355-RLY-TAB, 2014 WL 2884868, at *6 (S.D. Ind. June 25, 2014); *Wolf v. Walker*, 14-CV-64-BBC, 2014 WL 2558444, at *6 (W.D. Wis. June 6, 2014); *Whitewood v. Wolf*, 1:13-CV-1861, 2014 WL 2058105, at *6 (M.D. Pa. May 20, 2014); *Geiger v. Kitzhaber*, 6:13-CV-01834-MC, 2014 WL 2054264, at *1 n.1 (D. Or. May 19, 2014); *Latta v. Otter*, 1:13-CV-00482-CWD, 2014 WL 1909999, at *9 (D. Idaho May 13, 2014); *De Leon v. Perry*, 975 F. Supp. 2d 632, 648−49 (W.D. Tex. 2014); *DeBoer v. Snyder*, 973 F. Supp. 2d 757, 773 n.6 (E.D. Mich. 2014); *Bostic v. Rainey*, 970 F. Supp. 2d 456, 470 (E.D. Va. 2014); *Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252, 1277 (N.D. Okla. 2014); *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1195 (D. Utah 2013). The only post-*Windsor* case disallowing a challenge to a state ban on same-sex marriage is *Merritt v. Attorney Gen.*, CIV.A. 13-00215-BAJ, 2013 WL 6044329, at *2 (M.D. La. Nov. 14, 2013). The Court does not find *Merritt* persuasive, as the viability of *Baker* was not briefed, and the court did not clearly state that it was dismissing on *Baker* grounds.

rational basis for the classification, and the state need not present any evidence. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

The two heightened tiers of scrutiny demand more exacting judicial review. Under strict scrutiny, the state must show that the statutory classification is "narrowly tailored" to further a "compelling governmental interest[]." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). This standard is reserved for certain "suspect" classifications such as those based on race, alienage, and national origin. *See Graham v. Richardson*, 403 U.S. 365, 371−72 (1971). For a small number of "quasi-suspect" classifications, such as gender and illegitimacy, the courts apply intermediate scrutiny, under which the statutory classification must be "substantially related to an important governmental objective." *Clark*, 486 U.S. at 461.

The Court will first consider whether heightened review applies here based on the individual interest affected and will next consider the nature of the statutory classification.

A.

If the classification imposed by Kentucky's laws significantly interferes with the exercise of a fundamental right, "critical examination of the state interests advanced in support of that classification is required," *i.e.* strict scrutiny applies. *Zablocki*, 434 U.S. at 383 (quotation omitted). Kentucky's laws prevent all same-sex couples from marrying. This acts as a complete bar to Plaintiffs' ability to marry each other, thus satisfying the "significant interference" threshold. The only question that remains is whether the right Plaintiffs seek to exercise is a fundamental right—a question that neither the Supreme Court nor the Sixth Circuit has answered.

The right to marry is a fundamental right situated within the due process right to liberty. *See Loving v. Virginia*, 388 U.S. 1, 12 (1967) (marriage is a "fundamental freedom"); *Skinner v.*

7

*Oklahoma ex rel. Williamson,* 316 U.S. 535, 541 (1942) (marriage is "one of the basic civil rights"); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (the right to marry is a central part of Due Process liberty); *Maynard v. Hill*, 125 U.S. 190, 205 (1888) (marriage is "the most important relation in life"). The right to marry is a nonenumerated fundamental right; that is, it is not written in the Constitution. Its constitutional significance arises from various protected liberty interests, such as the right to privacy and freedom of association. *See Griswold v. Connecticut*, 381 U.S. 479, 486 (1965) (marriage is a "right of privacy older than the Bill of Rights"); *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) ("[c]hoices about marriage . . . are among associational rights this Court has ranked as 'of basic importance in our society'" (quoting *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971))).

Most of our liberty interests—*e.g.* privacy, autonomy, procreation, travel—exist independent of the government. By contrast, civil marriage and the government are inseparable. The state institution of marriage—the issuance of marriage licenses and the distribution of benefits based on marital status—has become an integral component of the fundamental right to marry. It is in this way that civil marriage has become "objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 720−21 (1997) (quotations omitted). This atypical tie to the government makes the fundamental right to marry all the more challenging to consider.

The three foundational right-to-marry Supreme Court cases are *Loving*, 388 U.S. 1, *Zablocki*, 434 U.S. 374, and, most recently, *Turner v. Safley*, 482 U.S. 78 (1987). *Loving* declared Virginia's anti-miscegenation law unconstitutional on both equal protection and due process grounds. *See* 388 U.S. at 11−12. *Zablocki* held that a state statute requiring a father to pay his past-due court-ordered child support payments before marrying violated the Equal

Protection Clause. *See* 434 U.S. at 390−91. *Turner* found that prisoners retain their fundamental right to marry. *See* 482 U.S. at 95. In that case, the Court's discussion of "elements" or "incidents" of marriage suggests that evaluating the application of the fundamental right to marry to this case might involve a discussion of the scope or contours of the right to marry. *Id.* at 95−96. Under this view, the question before the Court can be distilled to: is same-sex marriage part of or included in the fundamental right to marry, or is it something else altogether?

The best evidence of the Supreme Court's thinking on this question is found in Justice Kennedy's recent opinions involving sexual orientation-based classifications, *Lawrence*, 539 U.S. 558, and *Windsor*, 133 S.Ct. 2675. Both of these postdate the Supreme Court's major right-to-marry cases mentioned above. Both can be interpreted to have employed something more than rational basis review, but neither explicitly applied heightened scrutiny, even when intimacy, a right that seems firmly rooted in the fundamental right to privacy and autonomy, was directly at issue. *See Lawrence*, 539 U.S. at 564.

Just last year, *Windsor* held Section 3 of DOMA unconstitutional on both equal protection and due process grounds. *See* 133 S.Ct. at 2695. However, Justice Kennedy's opinion neither articulated a standard of review nor discussed the fundamental right to marry, despite having had the opportunity to do so. Although *Windsor* did not need to squarely address the application of the fundamental right to marry to reach its holding, Justice Kennedy's choice to remain silent on the question is significant. Justice Kennedy could have much more easily resolved the case by finding that DOMA implicated a fundamental right.

If the inquiry here is viewed as a contours-of-the-right question, holding that the fundamental right to marry encompasses same-sex marriage would be a dramatic step that the Supreme Court has not yet indicated a willingness to take. Further, it is a step that is

unnecessary to the ultimate result in this action. Given the current posture of relevant constitutional jurisprudence, this Court finds caution here a more appropriate approach to avoid overreaching in its own constitutional analysis.[9]

B.

The Court next considers whether the statutory classification at issue justifies heightened equal protection scrutiny, that is, whether homosexual persons constitute a suspect class. The Supreme Court has never explicitly decided this question. For the reasons that follow, the Court holds that they do.[10]

The Supreme Court's most recent case involving sexual orientation did not discuss this specific issue, nor did it declare what precise equal protection standard it applied. *See Windsor*, 133 S.Ct. 2675. In a different context, the Sixth Circuit has suggested that sexual orientation classifications should not receive heightened scrutiny. *See Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012). However, as this Court previously noted, "It would be no surprise . . . were the Sixth Circuit to reconsider its view." *Bourke*, 2014 WL 556729, at *4. The *Davis* decision applied rational basis review based on a line of cases explicitly relying on *Bowers v. Hardwick*, 478 U.S. 186 (1986). The Supreme Court unambiguously repudiated *Bowers* in its 2003 *Lawrence* decision. *See* 539 U.S. at 578 ("*Bowers* was not correct when it was decided, and it is not correct today."); *id.* at 575 ("[*Bowers's*] continuance as precedent demeans the lives of homosexual persons."). This Court, like other district courts in the Sixth Circuit, concludes that it must now conduct its own analysis to determine whether sexual orientation classifications should receive heightened scrutiny. *See, e.g.*, *Bassett v. Snyder*, 951 F. Supp. 2d 939, 961 (E.D.

---

[9] Under the inapplicable but analogous canon of constitutional avoidance, courts are instructed to exercise judicial restraint to avoid unnecessarily reaching a question of constitutional law. *Cf. Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346−48 (1936) (Brandeis, J. concurring) (listing seven situations in which constitutional avoidance is appropriate).
[10] This Court's *Bourke* opinion discussed but did not decide this issue. *See* 2014 WL 556729, at *4−5.

Mich. 2013) ("The tarnished provenance of *Davis* and the cases upon which it relies provides ample reasons to revisit the question of whether sexual orientation is a suspect classification under equal protection jurisprudence."); *Obergefell v. Wymyslo*, 962 F. Supp. 2d 968, 986 (S.D. Ohio 2013).

1.

The Supreme Court has identified four factors that determine whether a group of persons is a disadvantaged class for the purposes of equal protection analysis: (1) historical discrimination, *see Lyng v. Castillo*, 477 U.S. 635, 638 (1986); (2) the ability to contribute to society, *see City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440−41 (1985); (3) immutable defining characteristics, *see Lyng*, 477 U.S. at 638; and (4) political powerlessness, *see id.*[11] For the reasons that follow, the Court concludes that gay and lesbian persons are a disadvantaged class.

Historical discrimination against homosexual persons is readily apparent and cannot reasonably be disputed. Further, the Court cannot think of any reason why homosexuality would affect a person's ability to contribute to society. No court has concluded otherwise. The remaining two factors, immutability and political powerlessness, are slightly less straightforward.[12]

As to immutability, the relevant inquiry is not whether a person *could*, in fact, change a characteristic, but rather whether the characteristic is so integral to a person's identity that it would be inappropriate to require her to change it to avoid discrimination. *Accord Wolf*, 2014 WL

---

[11] Since *Windsor*, every court to consider these factors has concluded that each applies to homosexual persons. *See, e.g.*, *Wolf*, 2014 WL 2558444, at *27−29; *Whitewood*, 2014 WL 2058105, at *11−14.

[12] "Immutability and lack of political power are not strictly necessary factors to identify a suspect class." *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 442 n.10 (1985) ("'[T]here's not much left of the immutability theory, is there?'") (internal quotation omitted)); *id.* (citing *City of Cleburne*, 473 U.S. at 472 n.24 (Marshall, J., concurring in part and dissenting in part) ("The 'political powerlessness' of a group may be relevant, but that factor is neither necessary, as the gender cases demonstrate, nor sufficient, as the example of minors illustrates.") (internal quotation omitted)).

2558444, at *28; *see also Griego v. Oliver*, 2014-NMSC-003, 316 P.3d 865, 884 (N.M. 2013). For example, strictly speaking, a person *can* change her citizenship, religion, and even gender. Legislative classifications based on these characteristics nevertheless receive heightened scrutiny because, even though they are in a sense subject to choice, no one should be forced to disavow or change them. That is, these characteristics are "an integral part of human freedom" entitled to constitutional protection, as is sexual expression. *Lawrence*, 539 U.S. at 577. Thus, even if sexual orientation is not strictly immutable, it fits within the realm of protected characteristics "fundamental to a person's identity," which satisfies the immutability factor. *De Leon v. Perry*, 975 F. Supp. 2d 632, 651 (W.D. Tex. 2014); *see Wolf*, 2014 WL 2558444, at *28; *Bassett*, 951 F. Supp. 2d at 960.

Finally, the Court finds that homosexual persons are "politically powerless" within the constitutional meaning of this phrase. In discussing this factor, the Second Circuit noted: "The question is not whether homosexuals have achieved political influence and success over the years; they clearly have. The question is whether they have the strength to politically protect themselves from wrongful discrimination." *Windsor*, 699 F.3d at 184. Indeed, if the standard were whether a given minority group had achieved any political successes over the years, virtually no group would qualify as a suspect or quasi-suspect class. A more effective inquiry looks to the vulnerability of a class in the political process due to its size or political or cultural history. *See Wolf*, 2014 WL 2558444, at *29. Under this inquiry, Kentucky's laws against homosexual persons are "Exhibit A" of this powerlessness.

2.

Having found that all four factors clearly weigh in favor of heightened scrutiny, the Court must identify which level of heightened scrutiny applies. The Supreme Court has not fully explained how to distinguish between suspect and quasi-suspect classes.

Among the protected classifications, sexual orientation seems most similar to the quasi-suspect classes. Sexual orientation is not obvious in the way that race, a suspect class, is.[13] *Cf. Mathews v. Lucas*, 427 U.S. 495, 506 (1976) (finding illegitimacy a quasi-suspect class where "perhaps in part because illegitimacy does not carry an obvious badge, as race or sex do, . . . discrimination against illegitimates has never approached the severity or pervasiveness of the historic legal and political discrimination against women and Negroes"). It is certainly not more apparent than a person's sex, which is a quasi-suspect class. *See Craig v. Boren*, 429 U.S. 190, 197 (1976) (applying intermediate scrutiny to gender classifications); *Frontiero v. Richardson*, 411 U.S. 677, 685−86 (1973) (plurality opinion) (women face "pervasive" discrimination "in part because of the high visibility of the sex characteristic"). For this reason, to afford greater protection to sexual orientation than gender would seem inappropriate.

In addition, some courts have found sexual orientation similar to gender in various ways. *See Windsor*, 699 F.3d at 184−85 (listing parallels between the status of women at the time the Court found they constituted a suspect class and homosexual individuals today, and finding homosexual persons to be quasi-suspect class based in part on analogy to gender); *accord Wolf*, 2014 WL 2558444, at *29; *Whitewood v. Wolf*, 1:13-CV-1861, 2014 WL 2058105, at *14 (M.D. Pa. May 20, 2014). For example, although the acceptance of homosexual persons has "improved markedly in recent decades," they still face "pervasive, although at times more subtle,

---

[13] Of course, national origin and alienage are often not apparent and yet are suspect classifications.

discrimination . . . in the political arena." *Windsor*, 699 F.3d at 184 (quoting *Frontiero*, 411 U.S. at 685−86) (internal quotation marks omitted).

This Court finds that homosexual persons constitute a quasi-suspect class "based on the weight of the factors and on analogy to the classifications recognized as suspect and quasi-suspect." *Windsor*, 699 F.3d at 185. In so doing, it agrees with the Second Circuit and the many other district courts to confront this question. *See id.*; *see, e.g.*, *Whitewood*, 2014 WL 2058105, at *14; *Wolf*, 2014 WL 2558444, at *29. Quasi-suspect classes are given intermediate scrutiny. *See Clark*, 486 U.S. at 461. Therefore, here, the state must show that the sexual orientation classification imposed by Kentucky's laws is "substantially related to an important governmental objective." *Id*.

IV.

Ultimately, Kentucky's laws banning same-sex marriage cannot withstand constitutional review regardless of the standard. The Court will demonstrate this by analyzing Plaintiffs' challenge under rational basis review.[14]

Under this standard, Plaintiffs have the burden to prove either that there is no conceivable legitimate purpose for the law or that the means chosen to effectuate a legitimate purpose are not rationally related to that purpose. "Rational basis review, while deferential, is not 'toothless.'" *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 532 (6th Cir. 1998) (quoting

---

[14] In *Bourke*, the Court explored the question whether *Windsor* altered the application of rational basis review in the same-sex marriage context. *See Bourke v. Beshear*, 3:13-CV-750-H, 2014 WL 556729, at *6−7 (W.D. Ky. Feb. 12, 2014). The Court identified two principles from Justice Kennedy's opinion. The first is that "the actual purpose of Kentucky's laws is relevant to this analysis to the extent that their purpose and principal effect was to treat two groups differently." *Id.* at *6. The legislative history of Kentucky's constitutional ban clearly demonstrates the intent to permanently prevent the performance of same-sex marriages in Kentucky, which suggests animus against same-sex couples. *See id.* at *7 n.15. The second principle is that such a ban "demeans one group by depriving them of rights provided for others." *Id.* at *7. Kentucky's laws undoubtedly burden the lives of same-sex couples by excluding them from the institution of marriage and all of its associated benefits. While there is some evidence of animus against homosexual persons, many people likely supported Kentucky's laws based on sincere religious and traditional reasons. *Bourke* thus concluded that, absent a clear showing of animus, the Court must apply traditional rational basis review. *See id.*

*Mathews*, 427 U.S. at 510). Courts "insist on knowing the relation between the classification adopted and the object to be attained." *Romer*, 517 U.S. at 632. This "ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Id.* at 633.

A.

The Court will begin with Defendant's only asserted justification for Kentucky's laws prohibiting same-sex marriage: "encouraging, promoting, and supporting the formation of relationships that have the natural ability to procreate." Perhaps recognizing that procreation-based arguments have not succeeded in this Court, *see Bourke*, 2014 WL 556729, at *8, nor any other court post-*Windsor*, Defendant adds a disingenuous twist to the argument: traditional marriages contribute to a stable birth rate which, in turn, ensures the state's long-term economic stability.

These arguments are not those of serious people. Though it seems almost unnecessary to explain, here are the reasons why. Even assuming the state has a legitimate interest in promoting procreation, the Court fails to see, and Defendant never explains, how the exclusion of same-sex couples from marriage has any effect whatsoever on procreation among heterosexual spouses. Excluding same-sex couples from marriage does not change the number of heterosexual couples who choose to get married, the number who choose to have children, or the number of children they have. *See Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252, 1291 (N.D. Okla. 2014) ("Marriage is incentivized for naturally procreative couples to precisely the same extent regardless of whether same-sex couples (or other non-procreative couples) are included."). The Court finds no rational relation between the exclusion of same-sex couples from marriage and the Commonwealth's asserted interest in promoting naturally procreative marriages.

The state's attempts to connect the exclusion of same-sex couples from marriage to its interest in economic stability and in "ensuring humanity's continued existence" are at best illogical and even bewildering. These arguments fail for the precise reasons that Defendant's procreation argument fails.[15]

Numerous courts have repeatedly debunked all other reasons for enacting such laws. The Court can think of no other conceivable legitimate reason for Kentucky's laws excluding same-sex couples from marriage.

B.

To sidestep these obvious deficiencies, Defendant argues that the state is not required to draw perfect lines in its classifications. By this argument, the state can permissibly deny marriage licenses to same-sex couples but not other couples who cannot or choose not to procreate "naturally."

It is true that "[a] classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Heller v. Doe*, 509 U.S. 312, 321 (1993) (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)) (internal quotation marks omitted). However, that Kentucky's laws do not deny licenses to other non-procreative couples reveals the true hypocrisy of the procreation-based argument. *Cf. Bishop*, 962 F. Supp. 2d at 1291−92 (finding state laws' failure to deny marriage licenses to other non-procreative couples to be probative of a lack of rationality under the logic of *City of Cleburne*,

---

[15] Amicus the Family Trust Foundation phrased the state's interest slightly differently: "to channel the presumptive procreative potential of man-woman couples into committed unions for the good of children and society." It then went on to make the exact same arguments—chiefly, responsible procreation and child-rearing, steering naturally procreative relationships into stable unions, and promoting the optimal childrearing environment—that this Court in *Bourke* and other federal courts have rejected. *See* 2014 WL 556729, at *8. The Court sees no need to readdress these arguments and incorporates its *Bourke* discussion by reference.

473 U.S. at 448, as explained by *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 (2001)). Even "[r]ationality review has a limit, and this well exceeds it." *Id.* at 1293.

More importantly, the imperfect line-drawing argument assumes incorrectly that the Court bases its ruling on a comparison between same-sex couples and other non-procreative couples. On the contrary, this Court bases its ruling primarily upon the utter lack of logical relation between the exclusion of same-sex couples from marriages and any conceivable legitimate state interest. Any relationship between Kentucky's ban on same-sex marriage and its interest in procreation and long-term economic stability "is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446. This Court agrees with the many other federal courts that have found procreation-related arguments incapable of withstanding rational basis review. *See, e.g.*, *Baskin v. Bogan*, 1:14-CV-00355-RLY-TAB, 2014 WL 2884868, at *13 (S.D. Ind. June 25, 2014); *Geiger v. Kitzhaber*, 6:13-CV-01834-MC, 2014 WL 2054264, at *13 (D. Or. May 19, 2014); *DeBoer v. Snyder*, 973 F. Supp. 2d 757, 764−65 (E.D. Mich. 2014); *Bishop*, 962 F. Supp. 2d at 1291; *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1211−12 (D. Utah 2013).

In sum, the laws challenged here violate Plaintiffs' constitutional rights and do not further any conceivable legitimate governmental purpose. Therefore, Kentucky's laws cannot withstand rational basis review.

V.

In *Bourke,* this Court devoted considerable thought and effort to addressing the sincere questions and concerns of Kentuckians about the recognition of same-sex marriage. *See* 2014 WL 556729, at *10−12. All those comments are equally true today.

Not surprisingly, the *Bourke* opinion received significant attention and response, both in support and in opposition. Those opposed by and large simply believe that the state has the right to adopt a particular religious or traditional view of marriage regardless of how it may affect gay and lesbian persons. But, as this Court has respectfully explained, in America even sincere and long-held religious views do not trump the constitutional rights of those who happen to have been out-voted.

On the other side, many responses reinforced in very personal ways how unconstitutional discrimination harms individuals and families to their very core. These responses reinforce the notion that invalidating Kentucky's laws validates the enduring relationships of same-sex couples in the same way that opposite-sex couples' relationships are validated.

Since this Court's *Bourke* opinion, the legal landscape of same-sex marriage rights across the country has evolved considerably, with eight additional federal district courts and one circuit court invalidating state constitutional provisions and statutes that denied same-sex couples the right to marry. *See Kitchen v. Herbert*, No. 13-4178, 2014 WL 2868044 (10th Cir. June 25, 2014); *Baskin*, 2014 WL 2884868; *Wolf*, 2014 WL 2558444; *Whitewood*, 2014 WL 2058105; *Geiger*, 2014 WL 2054264; *Latta v. Otter*, 1:13-CV-00482-CWD, 2014 WL 1909999 (D. Idaho May 13, 2014); *De Leon*, 975 F. Supp. 2d 632; *DeBoer*, 973 F. Supp. 2d 757; *Bostic v. Rainey*, 970 F. Supp. 2d 456 (E.D. Va. 2014). With this opinion, this Court joins their company.

Sometimes, by upholding equal rights for a few, courts necessarily must require others to forebear some prior conduct or restrain some personal instinct. Here, that would not seem to be the case. Assuring equal protection for same-sex couples does not diminish the freedom of others to any degree. Thus, same-sex couples' right to marry seems to be a uniquely "free"

constitutional right. Hopefully, even those opposed to or uncertain about same-sex marriage will see it that way in the future.

The Court's holding today is consistent with *Bourke*, although it requires different relief. The ability to marry in one's state is arguably much more meaningful, to those on both sides of the debate, than the recognition of a marriage performed in another jurisdiction. But it is for that very reason that the Court is all the more confident in its ruling today.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED THAT to the extent Ky. Rev. Stat. §§ 402.005 and .020(1)(d) and Section 233A of the Kentucky Constitution deny same-sex couples the right to marry in Kentucky, they violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and they are void and unenforceable.

IT IS FURTHER ORDERED that for all the reasons set forth in this Court's Memorandum Opinion and Orders in this case dated February 28, 2014 and March 19, 2014, the order here is STAYED until further order of the Sixth Circuit.

This is a final and appealable order.

Date:

cc: Counsel of Record