IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

*ELECTRONICALLY FILED*

| | | |
|---|---|---|
| GREGORY BOURKE, ET AL. | ) | |
| | ) | |
| PLAINTIFFS | ) | |
| | ) | CIVIL ACTION NO. |
| and | ) | |
| | ) | 3:13-CV-750-CRS |
| TIMOTHY LOVE, ET AL. | ) | |
| | ) | |
| INTERVENING PLAINTIFFS | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEVE BESHEAR, ET AL. | ) | |
| | ) | |
| DEFENDANTS | ) | |
| | ) | |

\* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' SECOND MOTION FOR ATTORNEYS' FEES AND COSTS

Pursuant to Fed. R. Civ. P. 54(d), Plaintiffs Gregory Bourke, et al., and Intervening Plaintiffs Timothy Love, et al., hereby request an award of attorneys' fees and costs as authorized by 42 U.S.C. § 1988. The amounts requested are as follows:

For the law firm of Clay Daniel Walton Adams, PLC, attorney fees in the amount of $543,405.27 and costs totaling $18,948.87, as supported by the declarations and time/expense records attached as Exhibits A, E, F, I, and J;

For the Fauver Law Firm, PLLC, attorney fees in the amount of $219,150.00, and costs totaling $5,978.83, as supported by the declarations and time/expense records attached as Exhibits C, E, F, and K;

1

For the American Civil Liberties Union Foundation, attorney fees in the amount of $206,924.00, and costs totaling $7800.16, as supported by the declarations and time/expense records attached as Exhibits B, H, L, M, N and O;

For Jeffrey L. Fisher and the Stanford Law School Supreme Court Litigation Clinic, attorney fees in the amount of $154,875.00, as supported by the declarations and time/expense records attached as Exhibits D, G, and P.

## I.   PROCEDURAL HISTORY

Following the landmark decision by the United States Supreme Court in *United States v. Windsor,* 133 S. Ct. 2675 (2013), Plaintiffs Gregory Bourke and Michael DeLeon, et al. (hereinafter "the *Bourke* plaintiffs"), brought this challenge to Kentucky's marriage laws. The original defendants included Kentucky Attorney General Jack Conway and Kentucky Governor Steve Beshear. The *Bourke* Plaintiffs were four couples who had valid marriages from other jurisdictions that were not recognized by the Commonwealth. Their Second Amended Complaint alleged violations of the Fourteenth Amendment, as well as violations of the First Amendment, the Full Faith and Credit Clause, and the Supremacy Clause of the U.S. Constitution. (DN 31.) Plaintiffs also challenged Section 2 of the federal Defense of Marriage Act, 28 U.S.C. § 1738C. In their Motion for Summary Judgment, Petitioners argued that they suffered a number of tangible and intangible harms as a result of Kentucky's marriage laws. (DN 38.)

The Motion for Summary Judgment was opposed by both Defendants (DN 39) and an *amicus curiae*, the Family Trust Foundation of Kentucky, Inc. (DN 43) Plaintiffs were invited by the Court to respond to both the Defendants' and the amicus' arguments, which they did. (See DN 45, 46). On February 12, 2014, this Court issued a memorandum opinion granting Plaintiffs' Motion. (DN 47.) Judge Heyburn, guided by the recent precedent in *Windsor*, opined that same-sex couples may well be a

suspect class requiring heightened scrutiny, but declined to make that holding in light of Sixth Circuit precedent. (*Id*. at PageID #730-32.) The Court also opined that the nature of marriage as a fundamental right might also require that Kentucky's laws receive heightened scrutiny under the Fourteenth Amendment's Due Process clause. (*Id*. at PageID #732-33). The court ultimately concluded that the application of heightened scrutiny ought to emanate from a higher court, particularly since application of that standard would not affect the outcome of the case before it. Relying on *Windsor*; *Lawrence v. Texas,* 539 U.S. 558 (2003); *Romer v. Evans*, 517 U.S. 620 (1996); and *Loving v. Virginia,* 388 U.S. 1 (1967) this Court concluded that "Kentucky's denial of recognition for valid same-sex marriage violates the United States Constitution's guarantee of equal protection under the law, even under the most deferential standard of review." (*Id*. at PageID #725).

On February 14, 2014, after the initial opinion by this Court but before its final order, two unmarried couples who were denied marriage licenses in Kentucky (Timothy Love and Lawrence Ysunza, and Maurice Blanchard and Dominique James, hereinafter "the *Love* Plaintiffs") filed a Motion to Intervene. (DN 49.) The *Love* Plaintiffs challenged Kentucky's ban on issuing marriage licenses to same-sex couples. On February 27, 2014 the Court granted the *Love* Plaintiffs' motion, ordered the Intervening Complaint filed, and set a briefing schedule for the *Love* case. (DN 53.) The Court then issued a final Order granting summary judgment to the *Bourke* Plaintiffs and stayed the granted injunctive relief pending appeal. (DN 55.)

The Governor appealed the *Bourke* judgment on March 18, 2014. (DN 68.) The *Love* plaintiffs subsequently moved for summary judgment in this Court. (DN 77.) They argued that they suffered a number of harms similar to those suffered by the *Bourke* plaintiffs. Defendant Beshear filed a response which set forth new state interests justifying Kentucky's marriage laws. (DN 87.) Shortly after the district court briefing began in *Love*, the Sixth Circuit briefs in *Bourke* became due.

3

On July 1, 2014, this Court granted the *Love* Plaintiffs' Motion for Summary Judgment, ruling that Kentucky's marriage laws violated the Equal Protection Clause of the Fourteenth Amendment by denying Intervening Petitioners and all same-sex couples the right to marry in Kentucky. (DN 91.) The district court also stayed enforcement of its final Order "until further notice of the Sixth Circuit."

Defendant immediately appealed the summary judgment ruling and, with the Intervening Petitioners, filed a Joint Motion to Consolidate the *Love* and *Bourke* cases. The Sixth Circuit granted the motion and the cases were consolidated on July 16, 2014. (Order, Case No. 14-5291, DN 142-2). While this procedural move put both issues (licensure of marriage per *Love,* and recognition of valid out-of-state marriages per *Bourke*) before the appellate court, it required two separate rounds of briefing, the second occurring in an extremely compressed period of time.

Meanwhile, counsel was pelted with amicus briefs from individuals and organizations. In all, 30 amicus briefs were filed before the Sixth Circuit in the *Bourke/Love* cases alone. The five lawyers from the Fauver Law Office and Clay Daniel Walton Adams were solely responsible for briefing, reviewing, and analyzing the information in these briefs prior to argument. At the same time, cases from other jurisdictions were being decided across the country, and counsel's legal theories were regularly revised and reviewed in light of these decisions.

The Sixth Circuit heard oral argument in the *Bourke/Love* cases on August 6, 2014, along with similar marriage challenges on appeal from district courts in Tennessee, Ohio, and Michigan. The oral arguments, which lasted three hours, required extensive preparation and drew intense attention from national and international news media. In the meantime, the legal landscape continued to shift dramatically. *Baskin v. Bogan,* 766 F.3d 648 (7th Cir. 2014), was argued and decided while plaintiffs awaited the Sixth Circuit's decision. On October 6, 2014, the Supreme Court denied petitions for writs of certiorari arising from the decisions striking down marriage bans from the Fourth, Seventh, and

Tenth Circuits. *See Bogan v. Baskin*, 135 S. Ct. 316 (2014); *Rainey v. Bostic*, 135 S. Ct. 286 (2014); *Herbert v. Kitchen*, 135 S. Ct. 265 (2014).

The Sixth Circuit became the first (and ultimately only) appeals court to uphold a marriage ban, reversing this Court on November 6, 2014. *Deboer v. Snyder,* 772 F.3d 388 (6th Cir. 2014). The Circuit Court's Opinion was over 40 pages of analysis, followed by 20 pages of spirited dissent. What followed was an intense – and truly unprecedented – period of coordination and preparation by and among the undersigned attorneys, attorneys representing plaintiffs in Ohio, Michigan, and Tennessee, national civil rights organizations, and legal scholars.

The first challenge for the Kentucky team was preparing a petition for certiorari which would be considered before the end of the 2015 Supreme Court Term. Plaintiffs were obligated to file the petition no later than November 14, 2014. This gave the attorneys on this case – at the time still composed only of two small, private Louisville law firms – only eight days to draft a highly complex legal document, the variety of which most Kentucky attorneys never file in their careers, and one for which the Supreme Court rules typically allow 90 days to complete. (Sup. Ct. R. 13.) While the document was being drafted, the attorneys of Clay Daniel Walton Adams, PLC were able to successfully contract with highly experienced attorneys from the American Civil Liberties Union and from the Stanford Law School's Supreme Court Litigation Clinic in time to obtain their assistance on a reply brief in support of certiorari.

The Supreme Court accepted certiorari on all four cases from the Sixth Circuit on January 16, 2015. *Obergefell v. Hodges*, 135 S. Ct. 1039 (2015). From that point forward, to say that this case became a commitment which dominated the lives of the attorneys involved would be an understatement. The Supreme Court is a unique and exclusive venue, with a set of rules and procedures quite unlike those of the district and circuit courts. As such, in addition to the extensive research needed

by all attorneys on virtually every issue at every turn, the experience and insight of the outside lawyers was absolutely necessary. Moreover, while the Supreme Court ordered separate briefing from each state, the case was consolidated into only two questions (and therefore two oralists) for purposes of oral argument. Extensive cooperation and coordination between all the lawyers on all four teams, as well as with the Office of the Solicitor General of the United States, was required to ensure optimal representation of all of the Kentucky clients. And, of course, the entire process was under the media microscope every step of the way.

The case went through the briefing process rapidly at the Supreme Court. Plaintiffs' principal brief was due and filed on February 27, 2015. The Governor's response was due and filed on March 27. Plaintiffs filed their reply on April 17. Preparations for oral argument occurred throughout the entirety of this time, and included moot arguments in front of the top constitutional lawyers and scholars in the country. The case was argued on April 28, 2015, and many of the undersigned counsel spent the entirety of the week leading up to the argument in Washington D.C., attending and providing input into the moots which occurred at Howard Law School, Georgetown University, and the Office of the Solicitor General of the United States.

Throughout this process, counsel was being bombarded with amicus briefing from a colorful variety of organizations, as well as from several states and many individuals claiming an interest in the outcome. At last count, the total number of amicus briefs filed in the Supreme Court was 139. *See* Ilya Somin, *Amicus briefs in the same-sex marriage case*, The Washington Post (April 16, 2015), *available at* https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/04/16/amicus-briefs-in-the-same-sex-marriage-case/. This tally does not include the various filings by people seeking to intervene or to get certain justices recused, or the like. *See Tanco v. Haslam,* 135 S.Ct. 1169 (2015) (denying motion to intervene by man seeking to marry his computer); Foundation for Moral Law, *Foundation*

6

*Files Motion for Recusal*, *available at* http://morallaw.org/2015/06/16/foundation-files-motion-for-recusal/ (requesting the recusal of Justices Kagan and Ginsburg).

On June 26, 2015, the Supreme Court issued its opinion *sub nom. Obergefell v. Hodges*. As discussed further below, the opinion marks a complete victory by Plaintiffs in no uncertain terms. Justice Kennedy's majority opinion not only vindicates Judge Heyburn's prior opinions in *Love/Bourke*, but also his suspicions regarding the level of scrutiny to be applied to laws which discriminate based upon sexual orientation.

## II.  THE PRIOR FEE PETITION

On March 11, 2014, prior to the Governor's Notice of Appeal in the *Bourke* case, Plaintiffs filed an attorney fee petition for the time expended to date in *Bourke*. (DN 60.) Plaintiffs employed the lodestar calculation, requested a modest amount, and did not request an enhancement. (*Id*.) Both Defendants opposed the Motion. (DN 74, 75). Ultimately, this Court awarded Plaintiffs the amount they sought and more. Judge Heyburn wrote:

> This was a difficult, novel case in which Plaintiffs' counsel showed considerable skill and determination. Counsel's hourly rate of approximately $250, and their total hours of 275.54, was most certainly reasonable. In fact, the total seems quite modest. Because Plaintiffs undertook a difficult, unpopular case and achieved remarkable success, the Court concludes that counsel is entitled to a small bonus to account for this risk.

(DN 85). In all, the Court awarded $70,325.00 for attorney's fees, and $453.00 in costs.[1] Judge Heyburn's Order was not appealed, and the amount, which continues to accrue interest, has not yet been paid.

## III.  APPLICABLE STANDARD

---

[1]  An amount of $2310.00 was excluded from the original petition because it represented time spent on the *Love* Plaintiffs' intervening petition. Plaintiffs renew their request for that amount herein.

The Civil Rights Attorneys Fees Awards Act of 1976, 42 U.S.C. § 1988(b), provides: "In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title . . ., the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . ." Congress enacted section 1988 to encourage private litigation of civil rights claims. "When a plaintiff succeeds in remedying a civil rights violation . . . he serves 'as a "private attorney general," vindicating a policy that Congress considered of the highest priority.'" *Fox v. Vice*, 131 S. Ct. 2205, 2213 (2011) (quoting *Newman v. Piggie Park Ent., Inc.*, 390 U.S. 400, 402 (1968) (per curiam)). Because such litigation advances important civil rights, a prevailing plaintiff "'should ordinarily recover an attorney's fee' from the defendant." *Id.* (citation omitted). Awarding attorney's fees to prevailing civil rights plaintiffs "at once reimburses a plaintiff for 'what it cos[t] [him] to vindicate [civil] rights,' and holds to account 'a violator of federal law.'" *Id.* (citations omitted).

## IV.    PLAINTIFFS ARE THE PREVAILING PARTY

If, as Judge Heyburn states in his previous Opinion, the victory in the *Bourke* case was a "remarkable success," Plaintiffs' victory in *Obergefell* was all the more so. The success achieved at the Supreme Court was far beyond that necessary to be considered a prevailing party under 42 U.S.C. § 1988. A prevailing party is one that succeeds "on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Farrar v. Hobby*, 506 U.S. 103, 109 (1992) (citation omitted). It should be noted that Plaintiffs did not have to prevail on *all* of their claims to be entitled to an award of attorney's fees. *See Berger v. City of Mayfield Heights*, 265 F.3d 399 (6th Cir. 2001) (plaintiff held to be the prevailing party even though 12 of his 14 claims were dismissed); *Owner-Operator Indep. Driver Assn, Inc. v. Vissell*, 210 F.3d 595, 597 (6th Cir. 2000) (holding that "[a]ny enforceable judgment of comparable type of relief or settlement . . . will generally make a

8

plaintiff a 'prevailing party.'"). But, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).

In this case, Plaintiffs prevailed on all of their claims as argued in the appellate courts, and received the precise relief sought by their clients, without qualification or reservation of any kind. This case, which has often been referred to as the "most important civil rights case in a generation,"[2] will also have a profound effect on the rights of gay men and lesbians well into the future, both in the United States and internationally. Jeb Sharp, *Which countries will follow America in legalizing gay marriage?*, WCAI (June 26, 2015), *available at* http://capeandislands.org/post/which-countries-will-follow-america-legalizing-gay-marriage. It is almost impossible to speak of the case in terms that do not sound hyperbolic, but to label it a "total victory" is not unwarranted.

## V.   THE FEES REQUESTED BY PLAINTIFFS ARE REASONABLE

The lodestar approach is the approved method for to determining reasonable attorneys' fees. *See Hensley,* 461 U.S. at 433-37. The lodestar is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate. *Morales v. City of San Rafael,* 96 F.3d 359, 363 (9th Cir. 1996). A fee determined by this "lodestar method" is entitled to a "strong presumption" that it "represents the 'reasonable' fee." *City of Burlington v. Dague,* 505 U.S. 557, 562 (1992); *see also Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010).

A summary of the hours expended and claimed here, by attorney, is represented in the table below.

---

[2]   *See, e.g.*, David Savage, *Supreme Court weighs gay marriage; Justice Kennedy unexpectedly expresses doubt,* Los Angeles Times (April 28, 2015) (available at http://www.latimes.com/nation/la-na-court-gay-marriage-arguments-20150428-story.html).

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Daniel Canon | 678.1 | $250 - $300 | $196,342.50 |
| Laura Landenwich | 777.5 | $250 - $300 | $212,540.00 |
| L. Joe Dunman | 603.8 | $200 - $250 | $136,097.50 |
| James Esseks | 206.9 | $700 | $144,830.00 |
| Chase Strangio | 96.4 | $325 | $31,330.00 |
| Joshua Block | 76.91 | $400 | $30,764.00 |
| Jeffrey L. Fisher | 206.5 | $750 | $154,875.00 |
| Dawn Elliott & Shannon Fauver | 876.6 | $250 | $219,150.00 |

In addition to the basic lodestar calculation, courts consider the following factors in awarding fees: the novelty and complexity of the issues; the special skill and experience of counsel; the quality of representation; the results obtained; and the contingent nature of the fee agreement. *Morales,* 96 F.3d at 364. The application of these factors is discussed further below, but in sum, the hours and requested rates are reasonable and should be awarded by the Court.

### A.  The Total Number of Hours is Reasonable

Taking all appropriate factors into consideration, the time expended to achieve the results in this case was reasonable. Work was clearly divided between the attorneys, each taking specific responsibilities for the tasks at hand. The attorneys carefully edited all briefs, resulting in high-quality legal memoranda that clearly and succinctly identified the novel issues to be decided by the Court, and managed a group of twelve clients and their children who were originally split into two different cases. In addition, the coordination of effort among the four legal teams before the Supreme Court was both unusual and necessary to effective representation on an issue of national importance. To be sure, a lot of time was required, but the numbers reflected in this Motion are not unreasonable.

The complexity of the case and the sheer amount of work required to properly litigate it necessitated multiple attorneys. As this Court knows, using multiple lawyers in a case "is a common

practice, primarily because it results in a more efficient distribution of work. It allows more experienced, accomplished, and expensive attorneys to handle more complicated matters and less experienced, accomplished, and expensive counsel to handle less complicated ones." *Gautreaux v. Chicago Hsg. Auth.*, 491 F.3d 649, 661 (7th Cir. 2007). The method contemplated by *Gautreaux* is precisely the method by which Plaintiffs have litigated this case all along, as reflected by the billing records attached hereto.

To the extent that there is overlap in the hours expended by counsel, it was only as absolutely necessary. Courts have approved so-called "duplicative" billing, where two attorneys are billing for the same telephone conversation or meeting. The practice of law often (indeed usually) involves significant periods of consultation among counsel. In this case, those efforts were critical in creating cohesive arguments, strategizing novel legal theories, and assessing the implications of various positions. Talking through a set of authorities or seeking advice on a vexing problem is often significantly more efficient than one attorney's attempt to wade through the issue alone. *Tchemkou v. Mukasey*, 517 F.3d 506, 511-12 (7th Cir. 2008).

In any event, the multiplicity of attorneys and potential overlap in hours has already been addressed by Judge Heyburn:

> With a case such as this one that presents novel issues, and in which many plaintiffs are involved, the Court does not find staffing multiple attorneys on a single telephonic hearing deciding the important issue of whether the Court would grant a stay of its final order in the case objectionable.

 (DN 85). There is no reason why this rationale should not apply to the appellate proceedings in these cases, and with greater force.

Moreover, Plaintiffs' counsel have done everything in their power to run a streamlined, surgical campaign from the outset, litigating only what was necessary, and abandoning unsuccessful or tenuous strategies along the way. Given that the precise manner in which the challenged provisions of Kentucky law violated the federal Constitution was unclear, the early stages of this litigation were devoted to arguing more than just the Fourteenth Amendment claims. But it bears mention that once Judge Heyburn ruled on the merits of the original case on Fourteenth Amendment grounds, Plaintiffs did not cross-appeal that ruling or otherwise pursue claims not arising from the Fourteenth Amendment (though, as Judge Heyburn indicated, these claims cannot be said to have been "unmeritorious"; *See, e.g.*, *Bourke v. Beshear,* 996 F. Supp. 2d 542, 550, n.15) (W.D. Ky. 2014)). And every argument raised by Plaintiffs before the Sixth Circuit and the Supreme Court – all of which were grounded in the Fourteenth Amendment – ultimately prevailed.

Furthermore, no procedural delay can be attributed to Plaintiffs' handling of this litigation – quite the opposite. Unlike in many states, final judgments were obtained without extensive discovery or trial. Instead of filing two separate lawsuits, Plaintiffs filed an intervening complaint on behalf of the *Love* plaintiffs and ultimately consolidated their claims, reducing the need to expend additional judicial resources as well as minimizing the time, costs, and resources of both the undersigned counsel and Defendant.

Although the Kentucky case was the only case to encompass both questions presented to the Supreme Court in *Obergefell*, and while Kentucky counsel played a major role in helping prepare and shape the strategies for oral argument, the oralists ultimately selected were not explicitly affiliated with Kentucky. Therefore, no time has been claimed on their behalf in this petition.

The oralists are not the only legal professionals contributing to this massive effort whose time is not included in this Petition. Invaluable assistance was received from professors and students of the

University of Louisville Brandeis School of Law, as well as consulting attorneys from law firms, large and small, all over the country. Hundreds of hours of paralegal and clerk time expended by staff at Clay Daniel Walton Adams, PLC, the ACLU, and Stanford is not claimed here. See individual discussions *infra*, and Declaration of Daniel J Canon, attached hereto as Exhibit A. And several attorneys of record, who did countless cumulative hours of work at the Supreme Court level, have not asked for a single hour of compensation in this Petition. See Declaration of James Esseks, attached as Exhibit B.

In short, Plaintiffs present this Court with a modest petition; one that excludes literally hundreds of hours spent by dedicated, top-notch practitioners from our community and all over the country. Counsel does not seek a windfall, but does seek adequate compensation. As one declarant noted, "this is an all-encompassing project for an appellate practitioner . . . it would not be unreasonable for [the attorneys] to have billed all of their waking hours, and some of their non-waking hours, over the course of several months to prepare and present this case." (Declaration of Paul Hershberg, Exhibit F)

**B. The Issues Litigated were Exceedingly Novel and Complex**

Litigating a case in front of the Supreme Court always involves a degree of novelty because at least one party *must* be seriously arguing for a change in the law. The complexity of this case is discussed more fully *infra*. The legal team not only had to grapple with the ever-shifting legal landscape of marriage equality nationwide,[3] but also the changing theories put forth by the Defendants after *Bourke* was initially decided. (Compare DN #39 to DN #87.) By the time the case was presented to the Sixth Circuit for oral arguments, Kentucky counsel also had to be familiar with the rationales

---

[3] Only three federal courts had issued opinions on marriage equality after *Windsor* when Judge Heyburn issued *Bourke*. By the time the case reached the Supreme Court, approximately twenty-five more had been penned. *See* Freedom to Marry, *History and Timeline of the Freedom to Marry in the United States*, *available at* http://www.freedomtomarry.org/pages/history-and-timeline-of-marriage.

asserted to justify the marriage bans of *three other* states, whose arguments varied markedly from those put forth by the defense here.[4]

In addition, it is difficult to imagine a more diverse set of arguments presented by amici in the history of American jurisprudence. While no one lawyer could be intimately familiar with every argument advanced by every amicus, the plaintiffs' teams from all four states carried out a coordinated effort to ensure that we understood and responded to the important arguments in all of the amicus briefs filed. This was no small task, as evidenced by the photo of amicus briefs on the undersigned's desk, attached as **Exhibit Q**.

Finally, it should again be emphasized that Kentucky was the only state to litigate and present *both* questions considered by the Supreme Court. This in itself should denote the complexity and novelty involved in the Kentucky case.

### C. The Use of Outside Counsel Was Critical

A separate mention of the need for assistance from outside groups is warranted, as the hours expended by attorneys from Stanford Supreme Court Clinic and the ACLU comprise a large part of the fees sought in this Petition. First, the help of these groups was not enlisted until the Supreme Court level, when it was absolutely necessary. This strategy stands in stark contrast to nearly every other set of plaintiffs who brought marriage challenges in their respective states. The lawyers of Clay Daniel Walton Adams, PLC, and the Fauver Law Office litigated this case with minimal outside involvement until it became professionally unreasonable to continue doing so. And the professional unreasonableness of navigating a ship as large as *Obergefell* through the troubled waters of the Supreme Court without outside assistance is not merely a subjective determination. In December, 2014,

---

4   *See* Supreme Court of the United States, *Party Briefs on the Merits, available at*
    http://www.supremecourt.gov/ObergefellHodges/PartyBriefs/.

just after Plaintiffs had filed their Petition for Certiorari, Reuters published a special report entitled *The Echo Chamber*, which profiled the "elite bar" of the Supreme Court.

The article begins by noting the rarity of a grant of certiorari. The presence of a member of the small group of practitioners who regularly appear increases the chances that the Supreme Court will hear the case. One law professor noted that the Court may be reluctant to take a case from a lawyer they are unfamiliar with "fearing that doing so might lead to the acceptance of a case that's poorly presented or based on a moot legal question. Playing it safe spares the court the embarrassment of having to dismiss a flawed case after it has been fully argued." Said Justice Sonia Sotomayor: "I think it's malpractice for any lawyer who thinks this is my one shot before the Supreme Court and I have to take it." The article then lists some of the prominent advocates, including Jeffrey Fisher, who have appeared regularly before the Court and have gained its confidence. Joan Biskupic, et al., *The Echo Chamber,* Reuters (Dec. 8, 2014) (available at http://www.reuters.com/investigates/special-report/scotus/.) With the tight schedule, complex issues, unfamiliar territory, and issues of national social importance involved in this case, it was not only wise for the undersigned attorneys to enlist the help of specialists, it was imperative.

### D. Media Interviews Was Essential to Effective Representation

There was extensive media contact in this case, which necessitated the time and attention of counsel as well. Counsel has not billed for the entirety of this contact (which would be nearly impossible to catalog). Some hours, however, have been requested. Plaintiffs are mindful of Judge Heyburn's prior ruling that "media and public relations expenses are not properly included in the calculation of Plaintiffs' attorney's fees." *Love v. Beshear*, 2014 U.S. Dist. LEXIS 65945, *4 (W.D. Ky. May 13, 2014). Plaintiffs do not request the media hours previously rejected by this Court, nor the vast majority of hours spent on public relations generally. Nonetheless, the general rule is that time spent in

press conferences and other public relations work may be included when: (1) it substantially contributes to attainment of fee claimant's litigation goals; and (2) it would routinely be billed to clients by private attorney. *See, e.g., Davis v. City & Cnty. of San Francisco*, 976 F.2d 1536, 1545 (9th Cir. 1992).

The media hours claimed here fit the bill. Plaintiffs in this case were seeking the right to marry as part of the larger struggle to gain acceptance by mainstream society. Spending time attending to the media was not only necessary due to the high-profile nature of this case, but also because it "substantially contributed to the plaintiffs' goals" by humanizing them in front of national and international audiences. *See, e.g.,* Ellyn Pak, *Gay-rights activists try to humanize same-sex marriage*, Orange County Register (May 23, 2010) (available at http://www.ocregister.com/articles/gay-250044-hirata-marriage.html). Moreover, the complexity and long reaching effects of the case invited numerous media inquiries to assist with the accurate reporting of the case to a very interested public. Ignoring such requests would be detrimental to both Plaintiffs and the broader social discourse.

### E. Hours spent preparing fee petition

Counsel also requests compensation for the time spent preparing this Petition. Hours spent on preparing the fee motion are compensable as long as they are not disproportionate to the overall time spent by counsel on the merits of the case. *Gibson v. City of Chi.*, 873 F. Supp. 2d 975, 992 (N.D. Ill. 2012); *Coulter v. Tennessee*, 805 F.2d 146, 151 (6th Cir. 1986) (hours spent on fee motion are reasonable if they constitute 3% or less of the overall hours expended on the "the main case").

### F. The Requested Rates Are Reasonable

1. Local Counsel's Rates

As set forth in the attached declarations, the rates charged by lawyers of the Fauver Law Office and Clay Daniel Walton Adams, PLC, are reasonable for attorneys in the Louisville market. The

Supreme Court has repeatedly noted the Congressional intent that "the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases . . . ." *Blum v. Stenson,* 465 U.S. 886, 893 (1984) (quoting S.Rep't No. 94-1011 at 6, 1976 U.S.C.C.A.N. 5908, 5913); *see also Blanchard v. Bergeron*, 489 U.S. 87, 95 (1989). The local attorneys' rates, which top out at $300.00 per hour, are more than reasonable within the Sixth Circuit, as attested to by Louisville civil rights practitioners Gregory A. Belzley (declaration attached hereto as Exhibit E) and Paul Hershberg (declaration attached as Exhibit F).

### a. Fauver Law Office, PLLC Attorneys and Staff

The rates requested by the Fauver Law Office, PLLC, for the services of attorney Dawn Elliott and Shannon Fauver, have already been found reasonable by this Court in its prior Order. Fauver also claims paralegal time in the modest amount of $2800.00, representing only the time spent by its paralegal for travel to Washington, D.C. The Fauver Law Office originated this case shortly after the *Windsor* opinion was issued. Ms. Elliott and Ms. Fauver were unable to get the support of any local or national organizations when the case was initially filed, but took the initiative and risk to do so on their own, despite being a small law firm with little experience litigating civil rights cases. Fauver took the case and pursued it despite the odds because, quite simply, it was the right thing to do. For these reasons, and for those contained in Ms. Fauver's declaration, attached hereto as Exhibit C, the Fauver Law Office should be awarded the full amount it requests in this Petition.

### b. Clay Daniel Walton Adams, PLC Attorneys

The attorneys of Clay Daniel Walton Adams (CDWA) have had primary responsibility for this litigation since the time the Second Amended Complaint was filed (DN 31), a responsibility which they retained throughout the Supreme Court proceedings. The three attorneys from CDWA are dedicated civil rights practitioners. As explained in Mr. Canon's declaration (Exhibit A), these attorneys have

increased their rates by a modest amount since Judge Heyburn's Order on fees, but they do not seek a retroactive rate increase. Their rates are still quite reasonable in this market. See discussion of *Maxwell's Pic-Pac, Inc. v. Dehner,* 2013 U.S. Dist. LEXIS 34596, *11 (W.D. Ky. Mar. 12, 2013), *infra*. In addition, CDWA is not seeking compensation for any time expended by its clerks, paralegals, or other staff; time which would have increased this fee petition dramatically. For those reasons, and the reasons set forth in Mr. Canon's declaration, CDWA should be awarded the full amount requested.

### 2.    The Rates for ACLU and Stanford

As to the rates requested by attorneys from the ACLU and Stanford, local Kentucky billing rates should not apply, as these attorneys were only utilized at the Supreme Court level. Most of their work should be considered to have been performed in the Washington D.C. market, not in the Louisville area. The Sixth Circuit has observed that "[w]hen fees are sought for an out-of-town specialist, courts must determine (1) whether hiring the out-of-town specialist was reasonable in the first instance, and (2) whether the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation." *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995) (citing *Chrapliwy v. Uniroyal, Inc*., 670 F.2d 760, 768-69 (7th Cir. 1982)). Other circuits have used a similar approach. *See Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 259-60 (3d Cir. 1995); *Casey v. City of Cabool, Mo.,* 12 F.3d 799, 805 (8th Cir. 1993); *Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 317 (4th Cir. 1988); *Maceira v. Pagan*, 698 F.2d 38, 40 (1st Cir. 1983); *Donnell v. United States,* 682 F.2d 240, 252, 220 U.S. App. D.C. 405 (D.C. Cir. 1982).

Plaintiffs request the ACLU and Jeffrey L. Fisher be compensated at their current rates under what is known as the "adjusted *Laffey* matrix." This matrix has its origins in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354, 371 (D.D.C. 1983), which established the principle that awards of statutory attorney's fees in complex litigation in the D.C. metropolitan area should be standardized and

reflect rates charged by commercial litigators, based on each lawyer's years of experience. The *Laffey* case led to the establishment of the first *Laffey* matrix. The "adjusted" Laffey matrix is updated each year based on annual changes in the consumer price index for legal services. (A matrix maintained by the U.S. Attorney's office in D.C. also is revised each year, but it lags behind the adjusted index because instead of updating based on inflation in legal services, it updates based on inflation generally – that is, based on the cost of all goods and services, such as food and housing.) The current adjusted *Laffey* matrix can be found at http://www.laffeymatrix.com/see.html. The rate requested for all practitioners at the ACLU falls well below these rates. Furthermore, the rate requested by Jeffrey L. Fisher is far below what he could be expected to obtain, as evidenced by numerous cases in which the Supreme Court elite have requested fee awards. *See, e.g.*, Debra Cassens Weiss, *SCOTUS litigators charge as much as $1,800 an hour, filing says*, ABA Journal (Aug 10, 2015) (available at http://www.abajournal.com/news/article/scotus_litigators_charge_as_much_as_1800_an_hour_filing_s ays/) (noting that "Paul Clement of Bancroft charges $1,350 per hour, Theodore Olson of Gibson, Dunn & Crutcher charges $1,800 an hour, and E. Joshua Rosenkranz of Orrick, Herrington & Sutcliffe earns $1,020 an hour." Professor Fisher is undoubtedly of the caliber of these practitioners.). This is further supported by the declaration of Fisher himself, attached hereto as Exhibit D, and of veteran Supreme Court practitioner Walter Dellinger, attached as Exhibit G.

a.     *The American Civil Liberties Union*

At the Supreme Court level, Plaintiffs obtained the invaluable experience, resources, and insight of lawyers from the American Civil Liberties Union, and in particular of James Esseks. Esseks has been the director of the ACLU's LGBT & HIV Project since 2010. He was the litigation director of the Project from 2001 to 2010. His practice is based in New York, but the scope of his work is national. He was co-counsel in *Windsor*, a foundational case upon which the current federal marriage litigation has

been built. In addition to this case, he is or has been co-counsel in dozens of other marriage cases in state and federal courts throughout the country. He graduated from Harvard Law School and clerked for a federal district judge in the Southern District of New York, as well as a federal circuit judge in the Ninth Circuit. He worked for a private firm in New York prior to joining the ACLU. His claimed rate of $700 is commensurate with practitioners of similar skill and experience in the New York, New York market and is justified by his unique experience with marriage litigation nationwide. The reasonableness of his rate is further justified by the declaration of Anne L. Clark, a partner with the firm Vladeck, Raskin & Clark, P.C., in New York City, attached hereto as Exhibit H.

The contribution of the remaining ACLU attorneys who worked on the case, i.e., Chase Strangio, Joshua Block, Louise Melling, Leslie Cooper, and Ria Tabacco Mar, cannot be overstated. So as to avoid duplicity, Plaintiffs only seek compensation for the time of Strangio and Block. (See Exhibit B) These two attorneys brought unique experience and talent to the process and are to be credited with a substantial amount of the briefing done at the Supreme Court level. In addition, plaintiffs seek no compensation for the time spent by William Sharp of the ACLU of Kentucky, who also provided support and insight throughout the Supreme Court proceedings. Nor do Plaintiffs seek compensation for the considerable time expended by the ACLU's legal director, Steven R. Shapiro, who was personally involved at every turn of the Supreme Court phase of the litigation. Mr. Shapiro has unparalleled experience as a civil rights lawyer, especially before the Supreme Court, and the absence of his hours from the fee petition will undoubtedly save the Defendant many thousands of dollars. The Court should award the full amount sought in this petition on behalf of the ACLU's lawyers.

   *b. Jeffrey Fisher and The Stanford Law School Supreme Court Litigation Clinic*

As discussed above, Plaintiffs were joined by Jeffrey L. Fisher, and his students and colleagues at the Stanford Law School's Supreme Court Litigation Clinic, shortly after the Petition for Certiorari

was filed. A leading authority on Supreme Court practice and nationally recognized constitutional law scholar, Fisher's career is primarily devoted to handling cases in the U.S. Supreme Court. He has argued 27 cases in the Court, on issues ranging from criminal justice to maritime law to preemption, and is identified in the aforementioned Reuters article as one of only two practitioners in the country who consistently advocate for individual rights before the high Court.

Fisher and his team of extremely talented law students were crucial to the quality of the arguments ultimately put before the Supreme Court; arguments which Plaintiffs believe were integral both to the totality of the victory and the elegance with which Justice Kennedy's Opinion was crafted. In addition, Fisher's unique insights into the Court's processes provided invaluable assistance to the oralists as they prepared for argument. Countless hours expended by Stanford students and staff are not included in this Petition. The fees requested on behalf of Stanford's lawyers are imminently reasonable, and should be awarded by the Court.

### 3.   Rates in comparable cases

As discussed in Plaintiffs' prior petition, in *Maxwell's Pic-Pac, Inc. v. Dehner*, 2013 U.S. Dist. LEXIS 34596, *11 (W.D. Ky. Mar. 12, 2013) this Court awarded attorneys hourly rates ranging from "$475 - $180 for attorneys and $200 to $150 for paralegals." The attorneys in *Dehner* also claimed that the case involved difficult Equal Protection issues, making it readily comparable to the instant case. The Court's comprehensive analysis throughout *Dehner* is helpful to the resolution of this issue now, just as it was to Judge Heyburn's prior Opinion. The highest rate awarded in that case (two years ago) was higher than the highest rate requested by local attorneys in this case. And, of course, *Dehner* did not progress to the national stage, nor did it result in a similarly complete victory.

Similarly, the only other fee petition to have been filed by *Obergefell* plaintiffs thus far is that of the Plaintiffs in *DeBoer v. Snyder,* No. 2:12-cv-10285-BAF-MJH (E.D. Mich.) (DN 177)*.* Counsel in that case seek $350 per hour for all attorneys, which they explain is *less* than the 75th percentile of the billing rates in downtown Detroit. (Id., p.16, PageID #5158, noting the top rate of $525 per hour.) Also noteworthy is plaintiffs' fee petition in *Wolf v. Walker*, No. 3:14-cv-00064-bbc (W.D. Wis. 2014) (DN #164), in which a total amount of $1.2 million was sought for services in a case that was *not* accepted by the Supreme Court. The rates requested by two senior associates of Mayer Brown, who graduated from law school in 2009 and 2010, were $565 and $555, respectively – almost twice what Landenwich and Canon seek here, and more than twice the amount sought by the remaining Louisville lawyers. (*Id.*, p.19.) These rates were based on the Wisconsin market. And just two days ago, the District of South Carolina issued an opinion in *Condon v. Wilson*, 2:14-cv-04010-RMG, another successful marriage equality case, in which all the lawyers except one billed at rates over $300/hour; rates which were approved by the court. The undersigned's top rate of $300 per hour is therefore objectively reasonable.

## VI.     A FEE ENHANCEMENT IS APPROPRIATE

The Supreme Court has recognized circumstances under which a fee enhancement, above and beyond the normal lodestar calculation, may be appropriate. See *Perdue,* 559 U.S. at 565-67. For example, "an enhancement may be appropriate where the method used in determining the hourly rate . . . does not adequately measure the attorney's true market value, as demonstrated in part during the litigation." *Id.* 554-55. Additionally, an enhancement may be appropriate if there has been "an extraordinary outlay of expenses and the litigation is exceptionally protracted." *Id*., at 555. The Sixth Circuit has sometimes utilized a twelve-factor analysis for awarding fee enhancements:

(1) the time and labor required; (2) the novelty and difficulty of questions presented; (3) the skill needed to perform legal service properly; (4) the preclusion of employment by attorney due to acceptance of case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by client or circumstances; (8) the amount involved and the

results obtained; (9) the experience, reputation, and ability of the attorneys; (10) undesirability of case; (11) nature and length of professional relationship with client; and (12) awards in similar cases.

*Barnes v. City of Cincinnati*, 401 F.3d  729, 745 (6th Cir. 2005) (citing *Johnson v. Georgia Highway*, 488 F.2d 714, 717-19 (5th Cir. 1974)). As discussed throughout this Motion, all of the relevant factors in any enhancement analysis used by any court, including the *Barnes* and *Perdue* courts, favor a fee enhancement. As such, Plaintiffs request a fee enhancement of 75% (or 1.75) in this renewed petition. Specific reasons to grant a fee enhancement are explored further below.

### A.      The Protracted Litigation Was an Exceptional Success

As discussed above and in Judge Heyburn's original Order, plaintiffs enjoyed "remarkable success" in this litigation, and this is properly accounted for with a fee enhancement. See further discussion in § VI(f), *infra*. Though it all took place in a relatively short amount of time by litigation standards, this case meets the definition of "exceptionally protracted" within the meaning of *Perdue*, simply by virtue of the fact that it comprises two combined cases that had to be fully briefed in three different courts and coordinated with three other cases. And the protracted nature of this litigation can in no way be credited to Plaintiffs. The Governor has stated publicly, up to and including in his Response to Plaintiffs' Petition for Certiorari, that the Supreme Court should decide the matter. See Andrew Wolfson, *Beshear asks court to take gay marriage case*, The Courier-Journal (Dec. 10, 2014), available at http://www.courier-journal.com/story/news/local/2014/12/10/gov-steve-beshear-asks-supreme-court-take-gay-marriage-case/20191735/. And the Governor warned of "legal chaos" if the ruling went into effect in Kentucky prior to a ruling from the high Court. Associated Press, *Kentucky Governor Warns of "Legal Chaos" in Same-Sex Marriage Case*, CBS News (March 4, 2014), available at      http://www.cbsnews.com/news/kentucky-governor-warns-of-legal-chaos-in-same-sex-marriage-

case/. Whether or not any such "chaos" would have ensued is no longer an issue; the point is that the Governor cannot now disclaim the obligation to pay for the battle he repeatedly asked for.

**B.   The Litigation Was Exceptionally Complex**

It cannot seriously be argued that this litigation was not exceptionally complex. Research and briefing was required on a variety of novel legal issues, including, among others: the application of the federal right to travel; the interplay between sexual orientation discrimination, sex discrimination, and the federal Constitution; the operation of the Kentucky state constitution; the Supremacy Clause; the role of the Establishment Clause, etc.

It should be noted that the law regarding the claims brought by Plaintiffs involved not only a great deal of historical and legislative research, but also required counsel to stay abreast of a rapidly changing legal landscape. As this Court is well aware, since the *Windsor* opinion, there have been several opinions issued by district courts, all reaching slightly different conclusions, and all briefed under (sometimes substantially) different legal theories using different approaches. These nuances have left counsel on *terra incognita*, and have required more research than the average §1983 case. In addition, counsel was obligated to research social, cultural, and psychological issues (i.e., to engage in "Brandeis briefing") which would normally not be required in federal litigation. And the majority of all this research is unlikely to be of much use in further cases; one does not often litigate right-to-marry cases. The complexity and novelty of this case should, without more, be enough to justify a fee enhancement.

**C.   Risk and Lost Opportunities**

All the Kentucky-based attorneys in this litigation forewent significant opportunities in order to litigate this case. On average, each of the five local attorneys spent approximately twenty full work

24

weeks on this case, in addition to maintaining a full-time private practice. None of these five attorneys receive a salary; had this case been a loss for the Plaintiffs, those weeks would have been entirely uncompensated. And it was by no means a foregone conclusion that the case would be a success. This case was initially filed one month after the *Windsor* opinion. At that time, only *one* federal court had even remotely suggested *Windsor* would lead to recognition of out-of-state marriages, *Obergefell v. Kasich,* Case No. 1:13-cv-501 (S.D. Ohio, July 22, 2013) (Order Granting Plaintiffs' Motion for a Temporary Restraining Order) and no federal court had yet ruled in favor of equal licensure. The ensuing near-unanimity of the federal courts could not have been (and, for the most part was not) predicted. *See, e.g.,* Lila Shapiro, *Marriage Equality Lawsuits After DOMA Arise in South, Midwest, As Gay Right Groups Urge Caution*, Huffington Post, (Jul. 31, 2013), *available at* http://www.huffingtonpost.com/2013/07/31/marriage-lawsuits-doma_n_3679005.html (noting that Kentucky was not initially part of the ACLU's or Freedom to Marry's national strategy, and noting that "Kentucky attorneys Shannon Fauver and Dawn Elliott said they're aware of the anxiety they provoked this week by filing the first lawsuit challenging the constitutionality of Kentucky's same-sex marriage ban"). And indeed, the Sixth Circuit was the first (and only) appellate court to rule against marriage equality. But even by the time the Supreme Court granted certiorari, the outcome was by no means predetermined or predictable, even to close observers of the Court. *See, e.g.*, Tom Goldstein, *Lawyers as heroes or goats in the fight over same-sex marriage*, SCOTUSblog (January 19, 2015), *available at* http://www.scotusblog.com/2015/01/lawyers-as-heroes-or-goats-in-the-fight-over-same-sex-marriage/. The exceptional risk taken by the attorneys in this case, particularly those in the small Louisville firms, warrants a fee enhancement.

**D.**   **Unpopular Cause and Detrimental Effects**

Another factor militating in favor of a fee enhancement is the fact that this case was a largely unpopular cause, especially in the Commonwealth of Kentucky. See *Gonter v. Hunt Valve Co.,* 510 F.3d 610, 621, n. 7 (6th Cir. 2007) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974) ("undesirability" of the case is a factor to be considered in awarding fees)). The case has led to a number of undesirable consequences to counsel, and will likely continue to do so for the foreseeable future. The undersigned have faced protest groups at every major event in this case, have received random hate mail for two years now (see example attached as **Exhibit R**), and have even received threats of bodily harm from people in their own community who simply do not believe in the issues underlying the litigation. See declaration of Shannon Fauver, attached hereto as Exhibit C.

This is perhaps not surprising, since this issue is so divisive, and this Court has been dubbed "the first in the South to rule in favor of gay marriage." Michael A. Lindenberger, *Kentucky Judge Turns Gay Marriage Tide in the South*, TIME (Feb. 13, 2014), *available at* http://nation.time.com/2014/02/13/kentucky-judge-turns-gay-marriage-tide-in-the-south/.   And while the national tide may have turned, unfortunately little has changed in the attitudes of many Kentuckians. In a Bluegrass Poll taken just two weeks ago, 53% of Kentuckians are opposed to the *Obergefell* ruling, with only 38% in support. John Cheves, *Bluegrass Poll: Ky. voters split on fate of county clerks who refuse to issue same-sex marriage licenses*, Lexington Herald-Leader (Aug. 3, 2015), *available at* http://www.kentucky.com/2015/08/03/3972498_bluegrass-poll-majority-of-kentucky.html.

The attorneys of CDWA and the Fauver Law Office represent clients all over the region. Indeed counsel has jury trials forthcoming in rural areas of eastern and western Kentucky over the next year. Their involvement in this case must be carefully vetted during voir dire, and even then, there is a risk that juror bias may color the view of counsel's advocacy in these trials.

26

E.  **Case Law**

There is ample support in the Sixth Circuit for an enhanced fee. In *Hargett*, cited supra, the Circuit Court approved a 50% fee enhancement. In *Caudill v. Sears Transition Pay Plan,* 2011 U.S. Dist. LEXIS 45294 (E.D. Mich. Apr. 26, 2011), an ERISA class action where the Plaintiffs left enhancement to the Court's discretion, the Court applied a 50% enhancement of the lodestar amount "to ensure a reasonable compensation," bringing the total fee award to $758,016 and nearly back in line with the Plaintiffs' original fee request. *Id.* at *18-19. Reasons for the enhancement in *Caudill* apply to the instant case including, "Plaintiffs' counsel 'did an excellent job' in this matter, prevailing in what has been lengthy and complex [ ] litigation," "[c]ounsel have submitted declarations detailing their vast experience, reputation and ample ability" and "[t]he novelty and difficulty of the questions involved in this matter also justify an enhancement, as does the time and labor required". *Id.* *19 (quoting *Paschal v. Flagstar Bank*, 297 F.3d 431, 434 (6th Cir. 2002)). An "exceptional delay" in the payment of attorney fees can be ameliorated by allowing counsel to base the fee award on his or her current hourly rate, or by adjusting the fee based on historical rates to reflect its present value. *Id.*, at 556. Such a compensatory method is especially appropriate where the delay in adjudication is caused by the defense. *Id.*, at 556. See also *Gonter*, 510 F.3d at 617; *Barnes v City of Cincinnati*, 401 F.3d 729, 745 (6th Cir. 2005); and *Brotherton v Cleveland*, 141 F. Supp. 2d 907, 913 (S.D. Ohio 2001) (25% enhancement from the lodestar value for "exceptional success", a solo practitioner bringing a previously unrecognized cause of action).

Perhaps the most compelling precedent on this issue comes from the case of *Barnes v. City of Cincinnati*, 401 F.3d 729, 746 (6th Cir. Ohio 2005), which upheld a district court's 1.75 multiplier for attorney's fees after a jury verdict in favor of a transgender police officer who was subjected to workplace discrimination. Citing case law from around the country, the Sixth Circuit stated: "While use

of such a multiplier nearly doubled the award of attorneys fees, the district court enjoys wide discretion in awarding attorneys fees." *Id.* (citing *Guam Soc. Of Obstetricians & Gynecologists v. Ada,* 100 F.3d 691, 697 (9th Cir. 1996)(200 percent multiplier upheld because of the undesirability of the case and the exceptional nature of the case); *McKenzie v. Kennickell,* 277 U.S. App. D.C. 297, 875 F.2d 330, 338-39 (D.C. Cir. 1989)(awarding twenty five percent enhancement for exceptional results and where counsel "remained active in the litigation over a period of fifteen years"); *Brotherton v. Cleveland,* 141 F. Supp. 2d 907, 913 (S.D. Ohio 2001)(awarding 150 percent multiplier for solo practitioner who achieved exceptional results by taking an unpopular case others turned down and bringing to light a previously unrecognized cause of action); *Quinn v. Nassau County Police Dep't,* 75 F. Supp. 2d 74 (E.D. N.Y. 1999)(awarding ten percent multiplier in employment discrimination case due to ground breaking nature of case); *Hollowell v. Gravett,* 723 F. Supp. 107, 110 (E.D. Ark. 1989) (awarding seventy five percent quality enhancement where plaintiff's counsel prepared the case thoroughly and provided superb representation "under the most adverse circumstances."); *Shakman v. Democratic Org.,* 677 F. Supp. 933, 945 (N.D. Ill. 1987) (awarding a one third quality enhancement in a class action where the court noted the case had great significance and plaintiffs' counsel showed "imagination and creativity")).

On remand, the district court again awarded a 1.75 fee multiplier for post-verdict attorney's fees. *Barnes v. City of Cincinnati*, 2006 U.S. Dist. LEXIS 8826 (S.D. Ohio Feb. 21, 2006). In so doing, the court explained, "few lawyers locally or nationally would have readily taken on a case so highly controversial."

> [S]tatutes like 42 U.S.C. § 1988 rest on the premise that rewarding attorneys with market-rate lodestars-and, by extension, enhancing those lodestars in "exceptional cases" presenting particularly novel or complex issues-is necessary to achieve a "socially desirable" level of civil rights victories. If so, it makes little sense to offer civil rights attorneys enhanced incentives for favorably resolving novel or complex issues at the trial

court level, only to reduce or eliminate the enhancements once attorneys are called on to defend (and thus preserve) those favorable outcomes on appeal.

*Id.* at *8; *14.

On that note, it bears repeating that this Court's own prior opinion supports a fee enhancement. If *Bourke* was a "remarkable success" meriting a bonus, the final outcome of *Obergefell* represents a degree of success that no one could have anticipated when the case was originally filed. It should be noted that counsel did not request a fee enhancement in the first Petition; it was granted *sua sponte*. In this instance, it is appropriate to request an even greater fee enhancement, both in light of the factors discussed extensively above, and in recognition of the reasoning underlying Judge Heyburn's original set of opinions.

## VII.  THE AWARD OF COSTS IS REASONABLE AS REQUESTED

Pursuant to 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d)(1), and Fed. R. App. P. 39(d), certain litigation costs are ordinarily taxed against the non-prevailing party and in favor of the prevailing party. Furthermore, all litigation expenses in civil rights cases, including out-of-pocket expenses, are recoverable under 42 U.S.C. § 1988, as long as the expenses were reasonable and necessary to the litigation of plaintiff's claims and are not normally billed to the lawyer's paying clients as overhead. *Ramos v. Lamm,* 713 F.2d 546, 559-60 (10th Cir. 1983) (photocopying, postage, telephone, etc.). "The Act [42 U.S.C. § 1988] essentially shifts the costs of litigation from the victim to the violator." *Spell v. McDaniel*, 616 F. Supp. 1069, 1113 (E.D.N.C. 1985), aff'd in part, vacated in part on other grounds, 824 F.2d 1380, (4th Cir. 1987), *cert. den. sub nom. City of Fayetteville v. Spell*, 484 U.S. 1027 (1988).

On this point, the parties do not likely have much to dispute. Plaintiffs' counsel seek filing fees, printing costs, and travel costs, as itemized in Exhibits I, J, and K. The majority of these expenses pertain to the printing of briefs for the Supreme Court. Counsel does not seek the costs of phone calls,

copies, mileage, Lexis/Westlaw fees, or, for the most part, any costs pertaining to runners, clerks, or other staff members. These costs, if sought, would be quite substantial.

## VIII.    CONCLUSION

In conclusion, Plaintiffs respectfully request a fee award  in the amount of $2,091,297.34, which represents the fees and expenses incurred by nine attorneys from the date of the last fee petition, plus a fee enhancement of 75%, with interest thereon.


Respectfully submitted,


s/Daniel J. Canon
DANIEL J. CANON
LAURA E. LANDENWICH
L. JOE DUNMAN
CLAY DANIEL WALTON ADAMS, PLC
Meidinger Tower, Suite 101
462 S. Fourth Street
Louisville, KY  40202
(502) 561-2005
*Counsel for all Plaintiffs*

SHANNON FAUVER
DAWN ELLIOTT
FAUVER LAW OFFICE, PLLC
1752 Frankfort Ave.
Louisville , KY 40206
(502) 569-7710
www. fauverlaw.com
*Counsel for all Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true and correct copy of the foregoing was this 21st day of August, 2015, delivered via the CM/ECF system to all parties of record.

<u>s/Daniel J. Canon</u>
DANIEL J. CANON